SANDRA SMITH, Plaintiff-Appellee and Cross-Appellant, v. ELI LILLY & COMPANY *et al.*, Defendants-Appellants and Cross-Appellees (Penick Corporation *et al.*, Defendants and Cross-Appellees).

First District (1st Division)   Nos. 85—0633, 85—0880 cons.

Opinion filed May 25, 1988.—Rehearing denied August 22, 1988.

2

4

Wildman, Harrold, Allen & Dixon, of Chicago, and Shook, Hardy & Bacon, of Kansas City, Missouri (Richard C. Bartelt, of counsel), for Eli Lilly & Company.

Lord, Bissell & Brook, of Chicago (Hugh L. Moore and Judith A. Royal, of counsel), for Abbott Laboratories.

Connelly, Ruberry & Mustes, of Chicago (Michael P. Connelly, of counsel), for Premo Pharmaceutical Laboratories, Inc.

Coffield, Ungaretti, Harris & Slavin, of Chicago (J. Timothy Eaton and Daniel P. Albers, of counsel), for Carroll Dunham Smith Pharmacal Company and Kremers-Urban Company.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Stephen R. Swofford, J. Timothy Eaton, and Timothy M. Kelly, of counsel), for William H. Rorer, Inc.

William S. Grotefeld & Associates, P.C., of Chicago (Richard A. Vierling, of counsel) for S. E. Massengill Company.

Raymond J. Langer, of Elmhurst, for Harvey Laboratories, Inc.

Burditt, Bowles & Radzius, Ltd., of Chicago (Robert G. Epsteen, Richard E. Favoriti, and William F. Haley, of counsel), for Boyle & Company and E. R. Squibb & Sons, Inc.

John Cadwalader Menk & Associates, of Chicago (John Cadwalader Menk and Garry H. Walters, of counsel), for Ayerst Laboratories, Inc., and American Home Products Corporation.

Hayes & Power, of Chicago (John D. Hayes, William K. Hedrick, and David A. Novoselsky, of counsel), for Sandra Smith.

Mayer, Brown & Platt, of Chicago (James W. Gladden, Jr., and Judith M. Janssen, of counsel), for Penick Corporation and CPC International, Inc.

Johnson, Cusack & Bell, Ltd., of Chicago (William V. Johnson, Robert L. Nora, and Thomas H. Fegan, of counsel), for Merck & Company, Inc.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, James O. Nolan, Mayer Goldberg, Daniel J. O'Connell, and Lisa Marco Kouba, of counsel), for Rexall Drug Company.

Cassiday, Schade & Gloor, of Chicago (Michael J. Gallagher, Michael J. Morrissey, and Annette J. Regos, of counsel), for Carnick Laboratories, Inc.

Jerome H. Torshen, Ltd., and Garretson & Santora, both of Chicago (Jerome H. Torshen and Abigail K. Spreyer, of counsel), for Sterling Drug, Inc.

Sidley & Austin, of Chicago (William P. Richmond, John Dames, Barbara M. DeCoster, and Alan B. Silverberg, of counsel), for Armour Pharmaceutical Company and The Upjohn Company.

JUSTICE BUCKLEY delivered the opinion of the court:

The present consolidated appeal arises out of a pharmaceutical product liability action brought by plaintiff against various drug companies seeking recovery for injuries allegedly caused by her mother's ingestion of diethylstilbestrol (DES). The trial court granted the drug companies' joint motion for summary judgment as to counts I through IX of plaintiff's second-amended complaint, but denied the motion as to count X alleging a strict liability cause of action based upon the market share theory. Other companies were granted summary judgment on all counts of the complaint as they were determined not to be part of the relevant DES market. For the reasons set forth below, we affirm in part and reverse in part and remand the cause for further proceedings.

In 1952, Elizabeth Smith became pregnant with Sandra Smith, the plaintiff in this case. Having had a history of difficulty with pregnancy, Mrs. Smith consulted with her physician, Dr. Jack E. Davis of the Field Clinic in Chicago, Illinois. In March 1953, he prescribed DES, which Mrs. Smith took throughout the remainder of her preg-

nancy. At her deposition, Mrs. Smith described the medication as a "white tablet," "smaller than an aspirin" to be taken three times a day. On July 13, 1953, plaintiff was delivered by cesarean section.

Twenty-five years later, in September 1978, after undergoing a dilation and curettage, cervical biopsy, and excisional biopsy of the vaginal wall, plaintiff was diagnosed as having a form of cancer medically referred to as clear cell adenocarcinoma of the vagina, and shortly thereafter, underwent radical surgery. Plaintiff allegedly developed this cancer as a result of her *in utero* exposure to DES.

Mrs. Smith obtained her DES prescription from the Field Clinic pharmacy. While the pharmacy's records indicate that she was administered "Tab 98," 25-milligram tablets of DES, the identity of the specific manufacturer of the product was not disclosed. Moreover, Dr. Davis and the purchaser of the products stocked by the pharmacy are deceased.

In August or September 1980, plaintiff filed her initial complaint against more than 100 drug companies which allegedly distributed DES to the Field Clinic, 70 of which filed appearances.[1] In November 1982, plaintiff filed a second-amended complaint consisting of 11 counts.[2] Counts I through VI sound in, respectively, negligence, strict liability, breach of express warranty, fraud, breach of implied warranty, violation of the Federal Food, Drug and Cosmetic Act, and counts VII and VIII, in conspiracy. These counts pray for assessment of damages on various bases of "concerted action," "joint and several" liability and "joint enterprise" liability. Counts IX and X allege theories of negligence and strict liability, respectively, and invoke "market share" as the means of determining damages. The thrust of plaintiff's causes of action is the drug companies' alleged failure to properly test DES and to adequately warn of its dangers.

The following drug companies jointly moved for summary judgment on counts I through X of plaintiff's second-amended complaint: Abbott Laboratories, Eli Lilly & Company, Premo Pharmaceutical Laboratories, Inc., Carroll Dunham Smith Pharmacal Company, William H. Rorer, Inc., S. E. Massengill Company, Boyle and Company (the preceding seven companies hereinafter will be referred to as defendants), Penick Corporation, CPC International, Inc., Kremers-Urban Company, Merck & Company, Inc., American Home Products

---

[1]Many of the pharmaceutical companies named in plaintiff's initial complaint were either no longer in business or filed motions attacking jurisdiction, asserting change in corporate ownership, or charging error of identity.

[2]There is no motion pending on count XI of the complaint.

Corporation, Ayerst Laboratories, Inc., Harvey Laboratories, Inc., and Rexall Drug Company. Thereafter, the latter eight drug companies as well as Carnrick Laboratories, Inc., E. R. Squibb & Sons, Inc., Sterling Drug, Inc., Armour Pharmaceutical, The Upjohn Company, and Breon Laboratories, Inc. (cross-appellees) filed individual motions for summary judgment on the ground that they had not manufactured DES of the kind and size ingested by plaintiff's mother.[3]

On February 21, 1985, the trial court granted the joint motion for summary judgment on the first nine counts of plaintiff's second-amended complaint, but denied the motion with respect to count X, thereby adopting in its memorandum of opinion a strict liability cause of action based on the market share theory articulated by the California Supreme Court in *Sindell v. Abbott Laboratories* (1980), 26 Cal. 3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, *cert. denied* (1980), 449 U.S. 912, 66 L. Ed. 2d 140, 101 S. Ct. 285. In separate orders filed the same day, the trial court also granted the individual motions for summary judgment as to all counts of the complaint.

Pursuant to Supreme Court Rule 308 (87 Ill. 2d R. 308), this court granted defendants' application for leave to appeal the denial of their motion for summary judgment as to count X. Plaintiff cross-appealed, challenging the grant of summary judgment as to counts I through IX and the other orders entered against her on February 21. The two appeals have been consolidated for review.

■ Before addressing the issues they present, we note that " '[s]ummary judgment is properly granted only where there is no genuine issue of material fact [citations], and this is to be determined from the pleadings, depositions, affidavits, and admissions on file in each case [citations].' " (*People ex rel. First National Bank v. City of North Chicago* (1987), 158 Ill. App. 3d 85, 103, 510 N.E.2d 577, 588-89, quoting *Komater v. Kenton Court Associates* (1986), 151 Ill. App. 3d 632, 636, 502 N.E.2d 1295, 1297-98; see also Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c).) A party seeking summary judgment must affirmatively establish that his right thereto is clear, without doubt, and determinable solely as a matter of law. (*Schwaner v. Belvidere Medi-*

---

[3]American Home Products Corporation and Ayerst Laboratories filed a supplemental brief as defendants-appellants stating that they "inadvertently joined with certain defendants in an appeal urging reversal of that portion of the trial court's judgment order based on the *Sindell* market share theory," while at the same time urging as cross-appellees that their individual grant of summary judgment be sustained. Although American Home and Ayerst did not move to be dismissed as appellants from the joint appeal of defendants, we nevertheless will treat them as cross-appellees only for purposes of this decision.

*cal Building Partnership* (1987), 155 Ill. App. 3d 976, 508 N.E.2d 522.) In determining whether genuine issues of fact exist, the evidence must be construed strictly against the moving party, and any inferences reasonably drawn therefrom are to be resolved in favor of the motion's opponent. (*People ex rel. First National Bank v. City of North Chicago* (1987), 158 Ill. App. 3d 85, 510 N.E.2d 577.) With these standards in mind, we initially consider the history of DES as discussed in the record here and in numerous reported cases.[4]

DES is a synthetic substance which duplicates the activity of estrogen, a female sex hormone present in all women and crucial to female sexual development and fertility. The drug was discovered in the late 1930s by a group of British scientists, but its formula was not patented. As a result, DES was available for production and marketing to any pharmaceutical manufacturer.

Before DES could be marketed in the United States, however, approval of the Food and Drug Administration (FDA) was required. Under the provisions of the Federal Food, Drug and Cosmetic Act of 1938 (Pub. L. No. 717, 52 Stat. 1040 (1938)), each company wishing to market DES had to file a new drug application (NDA) with the FDA which outlined the proposed uses of the drug, clinical data establishing its safety, the drug's chemical composition, methods of manufacture, and proposed labeling. By 1940, 10 pharmaceutical manufacturers had submitted NDAs seeking permission to market DES for the treatment of vaginitis, engorgement of the breasts, excessive menstrual bleeding and symptoms of menopause. None of the proposed uses related to miscarriage prevention.

Believing that the individual NDAs did not contain sufficient clinical data to properly evaluate the safety or effectiveness of DES, the FDA requested that the drug companies submit their clinical data jointly in a "master file." Accordingly, several pharmaceutical manufacturers formed a "small committee," chaired by Eli Lilly & Co., which pooled the data gathered by each company filing an NDA for the approval of DES and presented the "master file" to the FDA. In late 1941, the FDA approved the production and marketing of DES

---

[4]See, *e.g., Collins v. Eli Lilly & Co.* (1984), 116 Wis. 2d 166, 342 N.W.2d 37, *cert. denied sub nom. E. R. Squibb & Sons, Inc. v. Collins* (1984), 469 U.S. 826, 83 L. Ed. 2d 51, 105 S. Ct. 107; *Martin v. Abbott Laboratories* (1984), 102 Wash. 2d 581, 689 P.2d 368; *McElhaney v. Eli Lilly & Co.* (D.S.D. 1983), 564 F. Supp. 265; *Bichler v. Eli Lilly & Co.* (1982), 55 N.Y.2d 571, 436 N.E.2d 182, 450 N.Y.S.2d 776; *Ryan v. Eli Lilly & Co.* (D.S.C. 1981), 514 F. Supp. 1004; *Sindell v. Abbott Laboratories* (1980), 26 Cal. 3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, *cert. denied* (1980), 449 U.S. 912, 66 L. Ed. 2d 140, 101 S. Ct. 285.

for purposes unrelated to pregnancy. Thereafter, the "small committee" dissolved.

Six years later, in 1947, the first supplemental NDAs for the use of DES as a miscarriage preventive were filed. Only a few companies performed their own experiments to determine whether DES was safe and effective for this purpose. Among these, none tested DES on pregnant laboratory animals. The applicants instead relied upon published studies done by independent researchers. Although the results of these studies received substantial criticism soon thereafter,[5] the supplemental NDAs were nevertheless approved, and DES continued to be marketed as a miscarriage preventive from 1947 to 1971. During this period, DES was prescribed for millions of pregnant women.

In 1952, the FDA determined that DES was generally safe, and thus no longer considered it a "new drug" within the meaning of the Federal Food, Drug, and Cosmetic Act. This action signified that any manufacturers wishing to produce and market DES could do so without having to file NDAs.

In 1971, Dr. Arthur Herbst and several other physicians published a study linking the outbreak in young women of clear cell adenocarcinoma, a form of cancer, with the ingestion of DES by their mothers during pregnancy.[6] Later that year, the FDA banned the marketing of DES for use by pregnant women. Today, the FDA continues to permit the use of DES in treatments for nonpregnancy-related disorders.

■ As noted earlier, the problem this DES plaintiff faces, as do many others,[7] is that she is unable to identify the particular drug

---

[5]See, *e.g.*, Dieckmann, Davis, Rynkiewicz & Pottinger, *Does the Administration of Diethylstilbestrol During Pregnancy Have Therapeutic Value?* 66 Am. J. Obst. & Gynec. 1062 (1953); Robinson & Shettles, *The Use of Diethylstilbestrol in Threatened Abortion*, 63 Am. J. Obst. & Gynec. 1330 (1952). This information was readily available to the drug companies, but they nonetheless continued producing and marketing DES for use in pregnancy.

[6]Herbst, Ulfelder & Poskanzer, *Adenocarcinoma of the Vagina: Association of Maternal Stilbestrol Therapy with Tumor Appearance in Young Women*, 284 N. Eng. J. Med. 878 (1971). Subsequent studies have confirmed the link between DES ingested by pregnant women and the incidence of cancer in their offspring. See, *e.g.*, Nordquist, Fidler, Woodruff & Lewis, *Clear Cell Adenocarcinoma of the Cervix and Vagina*, 37 Cancer 858 (1976).

[7]Currently, at least 500,000 DES daughters suffer from clear cell adenocarcinoma of the vagina and uterus as well as other conditions caused by their mothers' ingestion of DES. (Comment, *Sindell and Beyond: A Case for Imposing Punitive Damages in Market Share Litigation*, 17 Pac. L.J. 1445, 1449 (1986).) This has resulted in the filing of an estimated 1,000 suits against DES pharmaceutical manufacturers, most of which are still pending in the courts. Comment, *The Application of a Due Diligence Requirement to Market Share Theory in DES Litigation*, 19 J. L. Ref. 771 (1986).

company that she alleges caused her injury. DES was marketed generically by as many as 300 drug companies utilizing the same formula during a 24-year span, with different companies entering and leaving the market throughout this period. The problems arising from its use arose many years following exposure,[8] and during those intervening years, memories have faded, records have been lost or destroyed, and witnesses have either died or moved or their whereabouts are otherwise unascertainable. Consequently, we are presented with a conflict between recognizing a remedy for the DES plaintiff which will relax the traditional tort principle of causation in fact[9] and allowing possibly negligent pharmaceutical manufacturers to escape liability to the victims of this tragedy. Based on the legal, equitable, economic, and societal considerations underlying Illinois tort law and *Sindell v. Abbott Laboratories* (1980), 26 Cal. 3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, *cert. denied* (1980), 449 U.S. 912, 66 L. Ed. 2d 140, 101 S. Ct. 285, we elect to follow the former alternative and therefore adopt a form of market share liability as recognized in *Martin v. Abbott Laboratories* (1984), 102 Wash. 2d 581, 689 P. 2d 368, with respect to both counts IX and X. The trial court adopted the market share theory only with respect to count X, based on strict liability, yet we find no reason that market share should not equally apply to plaintiff's count IX, a negligence count.[10]

[8]Adenocarcinoma has a latency period of 10 to 20 years. Biebel, *DES Litigation and the Problem of Causation,* 51 Ins. Couns. J. 223, 227 (1984).

[9]As a general rule of products liability law, a plaintiff must prove that the defendant manufacturer actually made the product that caused the injury. *Schmidt v. Archer Iron Works, Inc.* (1970), 44 Ill. 2d 401, 256 N.E.2d 6, *cert. denied* (1970), 398 U.S. 959, 26 L. Ed. 2d 544, 90 S. Ct. 2173. See generally M. Shapo, The Law of Products Liability par. 12.21 (1987).

[10]Under a negligence theory, plaintiff would have to prove that a drug company breached a duty of care when it made or sold DES, that actual damage resulted from the breach of duty, and that the breach of duty was the proximate cause of her injury. (M. Polelle & M. Ottley, Illinois Tort Law 422 (1985).) Under a strict liability theory, plaintiff must establish that her injury resulted from a condition of the DES, that the condition was an unreasonably dangerous one, that the defendant company engaged in making or selling the drug, and that the company expected the DES to reach the consumer without substantial change. Plaintiff must also plead and prove in Illinois that the defendant manufacturer knew or should have known of the danger that caused the injury, and that the manufacturer failed to warn of that danger. (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 402 N.E.2d 194; see also M. Polelle & M. Ottley, Illinois Tort Law 574 (1985).) Thus, negligence differs from strict liability only in that it focuses on the conduct of the manufacturer as opposed to the nature of the product itself and the adequacy of the warning.

Although the California Supreme Court recently declined to subject drug manufacturers to what it terms "strict liability," it nevertheless concluded that such manu-

*Sindell*, like the instant case, involved a plaintiff who alleged she was injured by DES which her mother took during pregnancy to prevent miscarriage. She filed an action against various drug manufacturers, claiming that they had all produced DES, and stating causes of action for negligence, strict liability, violation of express and implied warranties, and false and fraudulent representations. After the plaintiff admitted that she was unable to identify the particular manufacturer of the DES ingested by her mother, the trial court sustained the defendants' demurrers without leave to amend and dismissed the action.

The supreme court reversed, and in so doing, modified the doctrine of "alternative liability" established in *Summers v. Tice* (1948), 33 Cal. 2d 80, 199 P.2d 1,[11] and formulated a new theory of manufacturers' liability based on market share. The court held that once a plaintiff has joined the manufacturers of a "substantial share" of the relevant market and has submitted a *prima facie* case on each element of the tort except identification of the direct tortfeasor, the burden of proof shifts to the defendants to exculpate themselves by demonstrating that they did not make the offending drug. (*Sindell*, 26 Cal. 3d at 612, 607 P.2d at 937, 163 Cal. Rptr. at 145.) Those defendants failing in this regard are held liable for the percentage of damages which reflects their share of the market. 26 Cal. 3d at 612, 607 P.2d at 937, 163 Cal. Rptr. at 145.

In reaching its conclusion, the *Sindell* court recognized that there was little likelihood that all the manufacturers who made DES at the

---

facturers' liability is conditioned upon their actual or constructive knowledge of risks inherent in the drug at the time of its sale or distribution. (*Brown v. Superior Court* (1988), 44 Cal. 3d 1049, 751 P.2d 470, 245 Cal. Rptr. 412.) In so doing, California has adopted a standard of measuring a drug manufacturer's liability totally consistent with strict liability in Illinois.

[11]In *Summers*, two hunters negligently shot in the direction of the plaintiff, but it could not be ascertained which hunter's bullet injured the plaintiff. In response to the plaintiff's inability to identify the actual tortfeasor, the court developed the theory of alternative liability, which has been codified in the Restatement (Second) of Torts, section 433B, and reads as follows:

"Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm." (Restatement (Second) of Torts §433B(3), at 441-42 (1965).)

This shift in the burden of proof on causation to defendants is justified on the ground that an innocent plaintiff should not suffer without a remedy because he or she is unable to identify which negligent defendant caused the harm. *Summers v. Tice* (1948), 33 Cal. 2d 80, 86-88, 199 P.2d 1, 4-5.

time in question were still in business or subject to the jurisdiction of the California courts, but, nevertheless, it found forceful arguments in the plaintiff's favor, stating:

"In our contemporary complex industrialized society, advances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer. The response of the courts can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs. Just as Justice Traynor in his landmark concurring opinion in *Escola v. Coca Cola Bottling Company* (1944), 24 Cal. 2d 453, 467-68, 150 P.2d 436, recognized that in an era of mass production and complex marketing methods the traditional standard of negligence was insufficient to govern the obligations of manufacturer to consumer, so should we acknowledge that some adaptation of the rules of causation and liability may be appropriate in these recurring circumstances. The Restatement comments that modification of the *Summers* rule may be necessary in a situation like that before us \*\*\*."[12] 26 Cal. 3d at 610, 607 P.2d at 936, 163 Cal. Rptr. at 144.

According to the *Sindell* majority, the most persuasive reason for finding that the plaintiff stated a cause of action was that "between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury." (26 Cal. 3d at 610-11, 607 P.2d at 936, 163 Cal. Rptr. at 144.) The court reasoned that from a policy standpoint, defendants are better able to bear the cost of the injury because such risk can be insured against by the manufacturer and, in turn, distributed among the public. The court further noted that manufacturers are in the best position to discover and guard against defects, and, therefore, holding a manufacturer liable for defects and any failure to

---

[12]The *Summers* rule has generally been limited to cases where all of the potential wrongdoers were joined as defendants and where the wrongdoers' actions occurred simultaneously and created substantially the same risk. (Restatement (Second) of Torts §433B(3), comment *h*, at 446 (1965).) However, the Restatement, anticipating the application of the rule to other situations, provides:

"[S]ome modification of the rule stated may be necessary because of complications arising from the fact that one of the actors involved is not or cannot be joined as a defendant, or because of the effect of lapse of time, or because of substantial differences in the character of the conduct of the actors or the risks which they have created." (Restatement (Second) of Torts §433B(3), comment *h*, at 446 (1965).)

Such a situation is clearly present in the DES case, where the large number of defendants makes complete joinder impossible.

warn provides an incentive to product safety. (26 Cal. 3d at 611, 607 P.2d at 936, 163 Cal. Rptr. at 144.) Where medication is involved, the court emphasized, consumers are virtually helpless to protect themselves.

Defendants here argue that the views espoused in *Sindell* represent a "radical and ill-considered change in the law," stressing that every other court which has considered the market share theory has rejected it. Such a statement is rather misleading.[13] Several courts outside California have either expressed support for or directly followed the *Sindell* principles. A Federal district court in South Dakota specifically adopted market share liability in DES litigation (*McElhaney v. Eli Lilly & Co.* (D.S.D. 1983), 564 F. Supp. 265), while a New Jersey court found the *Sindell* theory in a DES setting "a reasonable solution to determine the 'percentage share' among unexculpated defendants" (*Ferrigno v. Eli Lilly & Co.* (1980), 175 N.J. Super. 551, 573, 420 A.2d 1305, 1316; see also *Morris v. Parke, Davis & Co.* (C.D. Cal. 1983), 573 F. Supp. 1324 (California district court held that individual injured by the administration of a diptheria, pertussis and tetanus (DPT) vaccine would be entitled to recover punitive damages under market share theory); *Hardy v. Johns-Manville Sales Corp.* (E.D. Texas 1981), 509 F. Supp. 1353, *rev'd on other grounds* (5th Cir. 1982), 681 F.2d 334 (Texas Federal court accepted the market share

---

[13]To date, the highest courts of only two States, Iowa and Missouri, have unqualifiedly rejected all theories of collective responsibility in DES litigation. (*Mulcahy v. Eli Lilly & Co.* (Iowa 1986), 386 N.W.2d 67; *Zafft v. Eli Lilly & Co.* (Mo. 1984), 676 S.W.2d 241.) Other courts have rejected the theories either in the context of what they consider to be nonfungible products (see, *e.g., Goldman v. Johns-Manville Sales Corp.* (1987), 33 Ohio St. 3d 40, 514 N.E.2d 691 (asbestos); *Marshall v. Celotex Corp.* (E.D. Mich. 1987), 651 F. Supp. 389 (asbestos); *Case v. Fibreboard Corp.* (Okla. 1987), 743 P.2d 1062 (asbestos); *Bixler v. Avondale Mills* (Minn. App. 1987), 405 N.W.2d 428 (cotton flanellette)), or because the States in which they sit have not yet adopted any of the theories (see, *e.g., Griffin v. Tenneco Resins, Inc.* (W.D.N.C. 1986), 648 F. Supp. 964 (benzidine congener dyes); *Thompson v. Johns-Manville Sales Corp.* (5th Cir. 1983), 714 F.2d 581, *cert. denied* (1984), 465 U.S. 1102, 80 L. Ed. 2d 129, 104 S. Ct. 1598 (asbestos); *Morton v. Abbott Laboratories* (M.D. Fla. 1982), 538 F. Supp. 593 (DES); *Mizell v. Eli Lilly & Co.* (D.S.C. 1981), 526 F. Supp. 589 (DES); *Ryan v. Eli Lilly & Co.* (D.S.C. 1981), 514 F. Supp. 1004 (DES)). Still, some jurisdictions have not ruled on the propriety of market share liability. *Celotex Corp. v. Copeland* (Fla. 1985), 471 So. 2d 533 (asbestos); *Bichler v. Eli Lilly & Co.* (1982), 55 N.Y.2d 571, 436 N.E.2d 182, 450 N.Y.S.2d 776 (DES); *Burnside v. Abbott Laboratories* (Pa. Super. 1985), 505 A.2d 973 (DES); see also *Tigue v. E. R. Squibb & Sons, Inc.* (1987), 136 Misc. 2d 467, 518 N.Y.S.2d 891 (New York court declined to rule on the applicability of market share liability in DES case, but approved the proposition that defendants may be held liable absent product identification).

method of apportioning damages in an asbestos case on a preliminary basis for discovery purposes)). The Washington, Wisconsin, and Michigan Supreme Courts, as well as a Massachusetts Federal court, while not adopting market share *per se*, have modified alternative liability, somewhat along the lines of *Sindell*, to accommodate the unique situation presented by DES litigation. (*Martin v. Abbott Laboratories* (1984), 102 Wash. 2d 581, 689 P.2d 368; accord *George v. Parke-Davis* (1987), 107 Wash. 2d 584, 733 P.2d 507; *Collins v. Eli Lilly & Co.* (1984), 116 Wis. 2d 166, 342 N.W.2d 37, *cert. denied sub nom. E. R. Squibb & Sons, Inc. v. Collins* (1984), 469 U.S. 826, 83 L. Ed. 2d 51, 105 S. Ct. 107; *Abel v. Eli Lilly & Co.* (1984), 418 Mich. 311, 343 N.W.2d 164, *cert. denied* (1984), 469 U.S. 833, 83 L. Ed. 2d 65, 105 S. Ct. 123; see also *Shackil v. Lederle Laboratories* (1987), 219 N.J. Super. 601, 530 A.2d 1287 (directed trial judge to apply a "risk-modified market share analysis" in DPT vaccine case); *McCormack v. Abbott Laboratories* (D. Mass. 1985), 617 F. Supp. 1521; *Conley v. Boyle Drug Co.* (Fla. App. 1985), 477 So. 2d 600 (urges Florida Supreme Court to adopt modification of *Sindell*).) Even the supreme court of Massachusetts indicates that it, too, on an "adequate record," might recognize some relaxation of the traditional identification requirement so as to allow recovery against a defendant of that portion of a plaintiff's damages which is represented by that defendant's contribution of DES to the relevant market. *Payton v. Abbott Laboratories* (1982), 386 Mass. 540, 574, 437 N.W.2d 171, 190; see also *Vigiolto v. Johns-Manville Corp.* (W.D. Penn. 1986), 643 F. Supp. 1454, *aff'd* (3d Cir. 1987), 826 F.2d 1058 (predicts that Pennsylvania Supreme Court will recognize market share theory in an "appropriate factual situation").

More importantly, the risk-shifting considerations which so clearly guided the *Sindell* court in formulating its market share theory of liability have been repeatedly echoed in Illinois tort law. For example, in *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182, the Illinois Supreme Court noted the following justification for imposing strict liability on manufacturers of defective products:

> "Without extended discussion, it seems obvious that public interest in human life and health, the invitations and solicitations to purchase the product and the justice of imposing the loss on the one creating the risk and reaping the profit are present ***." 32 Ill. 2d at 619, 210 N.E.2d at 186.

These same concerns were reiterated by this court nearly 20 years later in *Boddie v. Litton Unit Handling Systems* (1983), 118 Ill. App. 3d 520, 455 N.E.2d 142, when determining what constituted a product for strict liability purposes. We commented:

"[T]his court has stated that the social policy justifications underlying the imposition of strict liability in tort rather than the dictionary definition of the term 'product' should be determinative on this issue. [Citation.] Those public policy considerations have been set forth as being: (1) the public interest in human life and health; (2) the invitations and solicitations of the manufacturer to purchase the product; (3) the justice of imposing the loss on the manufacturer who created the risk and reaped the profit; and (4) the superior ability of the commercial enterprise to distribute the risk of injury proximately caused by the defective condition of its product by passing the loss on to the public as a cost of doing business. [Citation.]" 118 Ill. App. 3d at 527, 455 N.E.2d at 147.[14]

Similarly, in *Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, 367 N.E.2d 1250, the supreme court applied the concept of duty in a negligence action just as "radically" as the court in *Sindell* and the trial court in this case applied the doctrine of strict liability. Responding to claims that the common law had not recognized a defendant's breach of duty to one not yet in existence at the time the alleged breach occurred, the *Renslow* court stated that changes in modern society and medicine require that duty not be treated as " 'sacrosanct in itself,' " but rather as " 'an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " (67 Ill. 2d at 356, 367 N.E.2d at 1254, quoting W. Prosser, Torts §53, at 325-26 (4th ed. 1971).) The court then concluded:

"We reaffirm the utility of the concept of duty as a means by which to direct and control the course of the common law. But examples of changing notions of legal duty in the area of products liability, as well as the progressive expansion of duty in prenatal cases already documented, demonstrate that duty is not a static concept.
\*\*\*

---

[14]The court in *Lowe v. Norfolk & Western Ry. Co.* (1984), 124 Ill. App. 3d 80, 463 N.E.2d 792, espoused a similar view of strict liability when it described the relationship between the doctrine and the Contribution Act (Ill. Rev. Stat. 1983, ch. 70, par. 301 *et seq.*) as follows:

"Strict liability, on the other hand, while being a related tort, is based on an entirely different policy, that of placing the onus on the one who has placed a defective product in the stream of commerce and reaped the profit therefrom. [Citations.] In effectuating this policy, indemnity is still recognized and applied by the courts." 124 Ill. App. 3d at 97, 463 N.E.2d at 805.

We believe that there is a right to be born free from prenatal injuries forseeably caused by a breach of duty to the child's mother." *Renslow*, 67 Ill. 2d at 357, 367 N.E.2d at 1254-55.

Concurring with the majority's decision above, the late Justice Dooley stated that "[c]ourts must take an active part in the development of the common law, although this may mean creativeness." (67 Ill. 2d at 361, 367 N.E.2d at 1257.) In response to critics who suggested that the court should not "legislate," he responded that courts "must remember that the body of law is not a repository of stagnant problems of society but a vital, moving force which deals with the current problems of society." (67 Ill. 2d at 362, 367 N.E.2d at 1257.) Citing the court's earlier opinion in *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 81, 117 N.E.2d 74, 79, Justice Dooley quoted:

"The common law has established itself in the history of jurisprudence because of its flexibility in its recognition of and adaptation to changing times and mores; and, as adopted by our legislature, 'is a system of elementary rules and of general declarations of principles, which are continually expanding with the progress of society, adapting themselves to the gradual changes of trade, commerce, arts, inventions and the exigencies and usages of the country.' [Citations.]" *Renslow*, 67 Ill. 2d at 362, 367 N.E.2d at 1257.

Based on the decisions noted above, it is apparent that the adoption of the principles announced in *Sindell* by the trial court do not represent a radical departure from Illinois law, but rather conform to existing principles which ensure that the risks inherent in defendants' products be borne by those who placed the product in the stream of commerce, not by innocent consumers.

Despite the sound policy reasons underlying the market share theory, defendants object to its adoption on various grounds, none of which are sufficiently compelling for this court to leave plaintiff remediless. Defendants first contend that there is no rational basis upon which to infer that any named defendant is responsible for plaintiff's injury since any one of the more than 300 companies which manufactured DES might have made the substance ingested by plaintiff's mother. In support of this argument, defendants contrast the present case with *Summers v. Tice* (1948), 33 Cal. 2d 80, 199 P.2d 1, where there was a 50% chance that one of the two defendants fired the shot that injured the plaintiff. It was in recognition of this disparity between *Summers* and the DES case, however, that the *Sindell* court rejected a strict application of the *Summers* alternative liability theory and instead concluded that the probability that any one defendant

supplied the injury-causing DES should be determined not by the number of manufacturers joined in the action, but by their respective market shares in the sale of DES.

We are cognizant, however, of the danger under *Sindell* that if less than 100% of the relevant market is present, the actual wrongdoer may not be held liable and, consequently, those defendants named may be required to pay more than their fair share of a judgment.[15] To illustrate, if a plaintiff joins two defendants, each with 35% of the market, each defendant will be liable for 50 rather than 35% of the plaintiff's total damages. Consequently, under such a theory, a defendant's liability would not be measured by the likelihood of its responsibility for the plaintiff's injuries, but by its financial ability to pay the entire judgment or a large portion of it. A defendant that paid a percentage of the judgment in excess of its market share would have the burden of seeking indemnity from other defendants, and it would bear the loss if potentially liable producers of DES were not amenable to suit or if a codefendant were bankrupt. *Brown v. Superior Court* (1988), 44 Cal. 3d 1049, 751 P.2d 470, 245 Cal. Rptr. 412.

■ Accordingly, we believe that the "modified alternate liability theory" of *Martin v. Abbott Laboratories* (1984), 102 Wash. 2d 581, 689 P.2d 368, based on substantially the same concerns as *Sindell*, offers a better approach in apportioning liability among defendant drug companies.[16] The *Martin* court developed its theory after finding that

---

[15]While the majority in *Sindell* was unclear on this issue, the decision seems to require, as the dissent points out (*Sindell*, 26 Cal. 3d at 617, 607 P.2d at 940, 163 Cal. Rptr. at 148) (Richardson, J., dissenting), that plaintiffs would receive a full recovery if less than 100% of the market were joined. The *Sindell* court declared, "Each defendant will be held liable for the proportion of the judgment represented by its share of that market unless it demonstrates that it could not have made the product which caused plaintiff's injuries." (26 Cal. 3d at 612, 607 P.2d at 937, 163 Cal. Rptr. at 145.) The court continued that once a plaintiff has met her burden of joining a "substantial share" of the market, defendants could cross-complain against other manufacturers who may have supplied the injurious product. (26 Cal. 3d at 612, 607 P.2d at 937, 163 Cal. Rptr. at 145.) This statement implies that the court intended the joined defendants to be held liable for 100% of the damages, since defendants have no apparent reason to cross-complain except to seek contribution; a right to contribution exists only in cases where the joined defendants may be held liable for more than their *pro rata* share of the judgment. Comment, *Sindell and Beyond: A Case for Imposing Punitive Damages in Market Share Litigation*, 17 Pac. L.J. 1445, 1450-51 & n.54 (1986). But see *Brown v. Superior Court of San Francisco* (1988), 44 Cal. 3d 1049, 751 P.2d 470.

[16]Those courts which have either rejected or modified *Sindell* have done so primarily because of its inherent distortion of a defendant's actual liability. See, *e.g.*, *Zafft v. Eli Lilly & Co.* (Mo. 1984), 676 S.W.2d 241, 246 ("market share liability con-

*Sindell* distorts liability because only a substantial share of likely defendants share the damages. Thus, under *Martin*, a plaintiff need commence suit against only one defendant and allege the following: (1) her mother took DES; (2) the DES caused her subsequent injuries; (3) the defendant produced or marketed the type of DES taken by her mother; and (4) this production or marketing of DES constituted a breach of a legally recognized duty to the plaintiff. (102 Wash. 2d at 604, 689 P.2d at 382.) The *Martin* court explained the plaintiff's burden of proof as follows:

"[T]he plaintiff need not prove that a defendant produced or marketed the precise DES taken by the plaintiff's mother. Rather, the plaintiff need only establish by a preponderance of the evidence that a defendant produced or marketed the *type* (e.g., dosage, color, shape, markings, size, or other identifiable characteristics) of DES taken by the plaintiff's mother; the plaintiff need not allege or prove any facts related to the time or geographic distribution of the subject DES." 102 Wash. 2d at 604-05, 689 P.2d at 382.

▪ Individual defendants may then exculpate themselves by establishing, by a preponderance of the evidence, that they did not produce or market the particular type of DES taken by the plaintiff's mother; that they did not market the DES in the geographic area where plaintiff's mother obtained the drug; or that they did not distribute DES in the time and period when plaintiff's mother ingested the drug. In fact, as we have previously noted, certain manufacturers here were granted summary judgment upon proof that they did not produce the DES ingested by plaintiff's mother.

tinues the risk that the actual wrongdoer is not among the named defendants, and exposes those joined to liability greater than their responsibility"); *McCormack v. Abbott Laboratories* (D. Mass. 1985), 617 F. Supp. 1521, 1527 (*Martin* significantly reduces the "disproportion between potential liability and actual responsibility" resulting under *Sindell*); *Collins v. Eli Lilly & Co.* (1984), 116 Wis. 2d 166, 190 n.9, 342 N.W.2d 37, 48 n.9 ("flaw in *Sindell's* reasoning *** [is] that it would appear to permit each defendant's market share to be increased proportionately to ensure that the plaintiff recovers her damages").

Several commentators have also criticized the *Sindell* theory on the same ground. (Miller & Hancock, *Perspectives on Market Share Liability: Time for a Reassessment?* 88 W. Va. L. Rev. 81, 89 (1985); Comment, *Overcoming the Identification Burden in DES Litigation: The Market Share Liability Theory*, 65 Marq. L. Rev. 609, 631 (1982); Fischer, *Products Liability—An Analysis of Market Share Liability*, 34 Vand. L. Rev. 1623, 1646 (1981).) For arguments favoring or rejecting *Sindell* and for proposed qualifications see generally M. Shapo, The Law of Products Liability pars. 12.21(3)(f)(i), (3)(f)(ii), at 12—93 through 12—95 (1987).

■■ ■ Defendants that are unable to exculpate themselves from potential liability are designated members of the plaintiff's DES market and are initially presumed to have equal shares of that market. Defendants may implead third-party defendants in order to reduce their presumptive share of the market,[17] or rebut this presumption by proving their actual market share by a preponderance of the evidence. Upon such proof, each defendant will be held liable for that portion of the total judgment represented by that share. Defendants who are unable to establish their actual market share will equally be liable for the remaining market.[18] If, on the other hand, all defendants prove their market share, and 100% of the market is not accounted for because of insolvent or unavailable producers, plaintiff will recover less than her total damages.[19] Although a plaintiff would not be guaranteed full recovery under the theory we recognize, we believe it adds to the rationality of the market share doctrine as well as provides an incentive for a plaintiff to join as many defendants as possible into the litigation.

In light of our decision to adopt the *Martin* approach to market share liability, we have overcome defendants' and critics' major objection to *Sindell*, namely its failure to define a "substantial share" of the relevant market. Under our theory, it is no longer necessary to require that plaintiff join a substantial share of the relevant market.

■■ With respect to the relevant market of those who have manufactured DES as a miscarriage preventive, we believe it can be narrowed and defined on a case-by-case basis according to the specific fact situation and the evidence presented.[20] Factors to consider in de-

---

[17]In order to inhibit defendants from randomly impleading insolvent corporations to reduce their share of presumptive liability, the Washington Supreme Court in *George v. Parke-Davis* (1987), 107 Wash. 2d 584, 733 P.2d 507, suggests that the impleading defendants should be required to establish the actual market share of the impleaded defendant. If this actual damage can be determined, it should then be included in the market share calculations. Of course, the plaintiff would not be able to recover those damages, but as the *George* court points out, that is a problem facing all plaintiffs.

[18]To illustrate, assume four *prima facie* defendants are joined in an action, one of which shows an actual market share of 16%. The three remaining defendants will each be potentially liable for 28% of the total judgment. Suppose, instead, that one defendant established an actual share of 16% and a second of 24%—the two remaining defendants will then each be potentially liable for 30%.

[19]Assume now that the four *prima facie* defendants show that their actual shares are, respectively, 10%, 15%, 20% and 25%. Under this scenario, plaintiff could only recover 70% of her total damages.

[20]A case-by-case analysis is likewise used in the area of antitrust enforcement, where courts are called upon to define the relevant market in determining whether a

fining the relevant market are the geographic market area,[21] time of ingestion, and physical characteristics of the subject DES.[22] This definition advances the ultimate goal of "market share alternate liability"; the imposition of liability only on those companies which could have manufactured the DES which caused the plaintiff's injuries.

We realize, as defendants point out, that in some cases "juries may well find it impossible" to accurately construct the DES market and determine each defendant's share of that market. We believe that if evidence exists which yields accurate market share figures in the plaintiff's particular geographic market, these figures should be used to the exclusion of any other data. If these figures do not exist, then other data, such as distribution figures within the county, State, or even in the country may in certain circumstances be introduced.[23] Clearly, it is within the trial court's discretion whether it is the national or regional figures which more closely approximate the relevant geographic market in a given case. Again, however, the drug companies have the burden of establishing their individual market shares, and if the figures they present are too speculative or inaccurate, then the *pro rata* formula in *Martin* applies.

We note that it is not uncommon when a new theory of law is grafted onto traditional doctrine for courts to leave the tailoring of claims to subsequent judicial decision. Illinois, in particular, has never

---

corporation has violated antitrust regulations. Comment, *Market Share Liability: A New Method of Recovery for D.E.S. Litigants*, 30 Cath. U.L. Rev. 551, 575 (1981).

[21]Justice Gunn, in his dissent in *Zafft v. Eli Lilly & Co.* (Mo. 1984), 676 S.W.2d 241, 248, delineated the geographic scope of the relevant market as the area of the plaintiff's mother's residence, drugstore, and pharmacist. Noting that proof of this issue would often be difficult, Gunn reasoned that "it is a difficulty which is more appropriately born by the manufacturers than by the plaintiffs—a legitimate concept in products liability. [Citations.]"

[22]In the present case, the record reveals that plaintiff's mother received a white "Tab 98," 25-milligram dosage of DES from the Field Clinic Pharmacy in Illinois between March and July 1953. The affidavit of Eli Lilly & Co. employee John N. Kraas, filed in support of defendants' joint motion for summary judgment, established that 81 drug companies marketed DES as a miscarriage preventive in that particular dosage and form during the relevant period.

[23]Defendants, analogizing to antitrust litigation, assert that acquiring relevant market share information would "require large expenditures of judicial time and energy." Defendants however, overlook the "judicial time and energy" which will be saved under the market share theory as it encourages class action suits, thus eliminating overcrowded court dockets and the prosecution of small claims which are often inhibited by the high costs of litigation. Moreover, inequitable inconsistencies between DES decisions will be minimized if all parties have their rights adjudicated in the same proceeding. Comment, *Market Share Liability: An Answer to the DES Causation Problem*, 94 Harv. L. Rev. 668, 674-75 (1981).

hesitated to adopt new theories of law, or modify existing principles to accommodate changing societal needs, simply because future deficiencies are inevitable. For example, in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, our supreme court acknowledged that the adoption of comparative negligence in Illinois would raise numerous issues which could not be resolved on the face of that opinion, but rather than refuse to implement this change in Illinois law, the court stated:

> "We believe that the use of special verdicts and special interrogatories will serve as a guide to assist the jury in its deliberations. We leave the resolution of other collateral issues to future cases." (85 Ill. 2d at 28, 421 N.E.2d at 898.)

Similarly, any uncertainties that develop in the application of the theory we adopt today may be resolved through "future cases."

Defendants also oppose the allocation of the burdens of proof under the market share theory, arguing that plaintiffs, rather than defendant drug companies, are in a superior position to offer identification information and that defendants are not tortiously responsible for plaintiffs' inability to identify the proper defendants. We disagree.

The fundamental premise of the market share theory is that the plaintiff lacks sufficient identification information to make out a cause of action under traditional standards of tort liability. The absence of such information is primarily due to the lengthy delay in the drug's effects and the consequent loss of evidence, as well as the generic marketing methods utilized by drug companies to promote and distribute DES. Additionally, any evidence that the plaintiff might possess or have access to regarding the type of DES taken by her mother, the relevant time period, and the place of ingestion is readily obtainable by defendants under modern discovery procedures, as it was in the present case. Robinson, *Multiple Causation in Tort Law: Reflections on the DES Cases,* 68 Va. L. Rev. 713, 733 (1982).

Regarding the absence of their tortious conduct, defendants maintain that no drug companies sold prescription drugs directly to patients, and others did not even sell directly to pharmacists. Further, defendants claim to have had no knowledge of or control over which company's product a pharmacist used in filling a physician's prescription. While these assertions may be true, arguably, the very tortiousness of defendants' failure to discover or warn of DES dangers was the primary reason why all parties failed to keep better records or remember the drug prescribed more vividly, since they were unaware of any reason to do so. (Comment, *DES & A Proposed Theory of Enterprise Liability,* 46 Fordham L. Rev. 963, 993 (1978).) Certainly, there

can be no implication that plaintiff is blameworthy for being unable to identify the responsible manufacturer as she was *in utero* at the time her mother took DES. In any event, neither condition set forth by defendants would preclude the application of the market share theory once plaintiff has proven her underlying causes of action. *Sindell v. Abbott Laboratories* (1980), 26 Cal. 3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, *cert. denied* (1980), 449 U.S. 912, 66 L. Ed. 2d 140, 101 S. Ct. 285.

Contrary to defendants' intimations, shifting the burden of proving causation in a multiple defendant action is not novel in Illinois. In *Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 415 N.E.2d 397, for example, our supreme court held that when a patient submits himself to the care of a hospital and is rendered unconscious for surgery, thereby preventing him from ascertaining the cause of resulting injuries, the doctrine of *res ipsa loquitur* will apply. As a result, the burden shifts to all defendants to dispel the inference that they exercised the control necessary under the doctrine.

In reaching its conclusion, the *Kolakowski* court relied primarily on the California Supreme Court decision *Ybarra v. Spangard* (1944), 25 Cal. 2d 486, 154 P.2d 687, the predecessor of *Summers* and *Sindell*. In *Ybarra*, the plaintiff suffered paralysis of his shoulder while undergoing an appendectomy. He subsequently sued all six doctors and nurses involved in the operation, but was unable to determine which defendant caused his injury. The court applied the doctrine of *res ipsa loquitur* and shifted the burden of proving causation to the defendants, reasoning that it would be unfair to require the plaintiff to identify the particular defendant that caused his injury because the plaintiff was unconscious during the operation. (25 Cal. 2d at 493-94, 154 P.2d at 691.) The court further noted that while only one was actively negligent, all defendants owed the plaintiff a duty "to see that no unnecessary harm came to him." 25 Cal. 2d at 491, 154 P.2d at 690.

This justification for shifting the burden is equally applicable in the DES context, since drug manufacturers also owe a special duty of care to the public. Plaintiff's mother, who ingested DES, relied on the manufacturers' research skills and assurances of safety, just as the patient who submits to an operation depends upon the special skills and assurances of hospital and other medical personnel. (Comment, *DES & A Proposed Theory of Enterprise Liability*, 46 Fordham L. Rev. 963, 990 (1978).) Moreover, plaintiff is no more at fault for her inability to identify the culpable defendant than were the unconscious patients in *Kolakowski* and *Ybarra*.

It is significant to note that shifting the burden of proof on the issue of causation in fact does not ensure plaintiff's recovery. Rather, we are considering the present issue in light of defendant's joint motion for summary judgment, and although we absolve plaintiff of identifying the particular tortfeasor who caused her harm, she must still establish, by a preponderance of the evidence, the other elements under *Martin* for our market share theory to apply.

We also find defendants' claim that the market share theory would expose them to "litigation that continuously expand[s] with the passage of time" and would make them "hostage[s] of chance" unpersuasive. Such an argument has already been considered and rejected by the Illinois Supreme Court in *Renslow v. Mennonite Hospital* (1977), 67 Ill. 2d 348, 367 N.E.2d 1250. In response to the defendants' claim that "the need for an end to responsibility, short of perpetual liability for a single wrongful act, dictates that a duty for preconception torts not be imposed," the *Renslow* court stated that the damage alleged before it was neither self-perpetuating nor did litigation of that nature present a situation where the judiciary could not "effectively exercise its traditional role of drawing rational distinctions, consonant with current perceptions of justice, between harms which are compensable and those which are not." (67 Ill. 2d at 358, 367 N.E.2d at 1255.) Similarly, the nature of the claim brought by plaintiff here is hardly "self-perpetuating" nor does it realistically extend beyond plaintiff's generation, particularly since DES is no longer produced and marketed as a miscarriage preventive.

■ Equally unavailing is defendants' contention that adoption of the market share theory of liability by this court would run counter to the important public policy favoring the development and marketing of new drugs. Indeed, despite the emergence of the market share theory of liability, pharmaceutical firms' expenditures on research and development have risen significantly.[24] Moreover, imposition of market share liability for defects or inadequate testing or warning will provide incentive to drug companies to produce and market safe generic drugs (*Collins v. Eli Lilly & Co.* (1984), 116 Wis. 2d 166, 192-93, 342 N.W.2d 37, 49-50, *cert. denied sub nom. E. R. Squibb & Sons, Inc. v. Collins* (1984), 469 U.S. 826, 83 L. Ed. 2d 51, 105 S. Ct. 107), and will encourage manufacturers to differentiate their products as well as maintain

---

[24]"This year, despite their profit worries, many [drug companies] have approved double-digit increases in R & D spending pushing it to record levels. Werck's budget increased more than 12%, to $500 million. Smith Kline Beckman Corp.'s rose 10.7% to $293 million." *Prescription Drugmakers Try to Cope with a Dose of Adversity*, Business Week, Sept. 17, 1984, at 132.

more detailed records[25] so that proof of causation problems would be less likely to arise in the future. (*McCormack v. Abbott Laboratories* (D. Mass. 1985), 617 F. Supp. 1521, 1528.) So long as pharmaceutical companies properly test drugs and thereby produce a reasonably safe product, they need not fear liability under the rule in this case.

Although overdeterrence is not a problem with DES, we realize the market share approach may not be suitable for application across the broad range of products liability law, especially where the products or alleged defects are not identical. In contrast to DES pills, which "are assumed to be equally harmful with respect to the market as a whole, [and where] the total volume of DES marketed corresponds directly to the amount of risk created," the theory is not appropriate in circumstances "in which the product in question is not uniformly harmful, *** since the total risk created by any manufacturer would be a function of both its share of the market and the relative harmfulness of its product." (Comment, *Market Share Liability: An Answer to the DES Causation Problem*, 94 Harv. L. Rev. 668, 679 (1981).) Recently, several courts have declined to extend market share to asbestos cases, in part because of the nonfungibility of asbestos fibers as compared with DES. (See, *e.g.*, *Goldman v. Johns-Manville Sales Corp.* (1987), 33 Ohio St. 3d 40, 514 N.E.2d 691; *Marshall v. Celotex Corp.* (E.D. Mich. 1987), 651 F. Supp. 389; *Case v. Fibreboard Corp.* (Okla. 1987), 743 P.2d 1062; see also M. Shapo, The Law of Products Liability pars. 12.21(4)(a), (4)(b), at 12—95 through 12—97 (1987).) Given the crucial distinctions between DES and other manufactured goods, we confine our market share theory to the particular facts of the instant case.

Defendants next maintain that the market share theory renders pharmaceutical companies uninsurable and thus unable to absorb the costs of liability. These economic considerations have arisen where courts have contemplated any expansion of products liability law. In *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, for instance, the defendants claimed that the adoption of comparative negligence in Illi-

---

[25]Two commentators have advocated more detailed record keeping by pharmaceutical companies:

"Given existing industry practices in documenting product batch lot numbers it is not unreasonable to assume that additional record keeping would be a viable alternative. With the current technological advances in information processing the cost of such an alternative should not be prohibitive, and furthermore, these costs can be expected to diminish as technology improves." Miller & Hancock, *Perspectives on Market Share Liability: Time for a Reassessment?* 88 W. Va. L. Rev. 81, 110-11 (1985).

nois would escalate insurance rates to an unbearable level. The supreme court, however, found the effects on the cost of insurance to be "minimal." (85 Ill. 2d at 19, 421 N.E.2d at 894.) Here, the drug industry is apparently in good financial health,[26] and individual manufacturers can insure against drug-related losses. Such losses would be appropriately distributed, via increased prices, to those members of the public that benefit the most by the drug industry's activities, that is drug consumers.

Finally, it was urged by defendants at oral argument that plaintiff's remedy in this type of case should be fashioned by the legislature, not by this court, citing black lung legislation as an example. Again, we disagree with defendants. Reflecting on the role of the legislature in Illinois, the court in *Alvis v. Ribar* stated:

"We believe that the proper relationship between the legislature and the court is one of cooperation and assistance in examining and changing the common law to conform with the ever-changing demands of the community. There are, however, times when there exists a mutual state of inaction in which the court awaits action by the legislature and the legislature awaits guidance from the court. Such a stalemate is manifest injustice to the public. When such a stalemate exists and the legislature has, for whatever reason, failed to act to remedy a gap in the common law that results in injustice, it is the imperative duty of the court to repair that injustice and reform the law to be responsive to the demands of society." 85 Ill. 2d at 23-24, 421 N.E.2d at 896.

See also M. Shapo, The Law of Products Liability par. 12.21(6), at 12—97 through 12—98 (1987).

In the instant matter, no statutes exist which constrain this

---

[26]*Sindell* and its progeny have not bankrupted Abbott Laboratories, as the company reported record sales and profits last year. (*Chicago Tribune*, July 10, 1987, §3, p. 2.) Similarly, in its 1986 annual report, Eli Lilly & Co. reported that for the 26th consecutive year, it achieved increased sales and earnings, with the human health segment, led by pharmaceutical products, as its greatest contributor to growth. Lilly's worldwide sales increased by 14% in 1986, and its net income increased by 8% over the previous year. Referring to DES and other litigation, Lilly states that "such actions will not ultimately result in liability that would have a material adverse effect on the company's consolidated financial position." (Eli Lilly & Co. 1986 Annual Report 35.) In its 1985 annual report, E. R. Squibb & Sons, Inc. reported that worldwide sales of its pharmaceutical products continued upward in 1985, reaching $1.2 billion, an increase of 10%, following a 4% increase in the previous year. According to Squibb, "[t]he corporation's financial position remained strong during 1985." E. R. Squibb & Sons, Inc., 1985 Annual Report 47.

court's ability to develop "the common law to conform with the ever-changing demands of the community." Further, the plight of plaintiff and others similarly situated creates what is arguably "a gap in the common law that results in injustice," making it the "imperative duty of *** [this] court to repair that injustice and reform the law to be responsive to the demands of society." We have fulfilled this judicial function today by recognizing a remedy for plaintiff under the special circumstances of this case.

Having adopted the market share theory of liability as alleged in both counts IX and X of plaintiff's second amended complaint, we now address whether the trial court properly granted defendants' joint motion for summary judgment with respect to counts I through VIII. In these counts, plaintiff suggests additional bases upon which defendants may be held liable even though she is unable to identify the manufacturer which produced the DES in question. We believe that these doctrines set forth by plaintiff, for the reasons discussed below, are insufficient to impose liability upon defendants under the present facts.

Plaintiff first proposes that we adopt the "concerted action" theory of liability.[27] Concerted action applies when a tortious act is done in concert with another or pursuant to a common design, or a party gives substantial assistance to another knowing that the other's conduct constitutes a breach of duty. (Restatement (Second) of Torts §§876 (a), (b), at 315 (1977).) The parties need not expressly agree to commit the tortious acts, but they cannot be held liable unless there is a tacit understanding between them. W. Prosser, Torts, §46, at 292 (4th ed. 1971).

The thrust of plaintiff's charge of concert is that defendants failed to adequately test DES or to provide sufficient warning of its dangers, and that they relied upon tests performed by one another and took advantage of each others' promotional and marketing strategies. We agree with the majority of courts that have held these allegations do not support a finding of a tacit agreement between drug companies to produce and market DES without adequately testing the drug or warning of its potential dangers. (See, *e.g., Sindell v. Abbott Laboratories* (1980), 26 Cal. 3d 588, 607 P. 2d 924, 63 Cal. Rptr. 132, *cert. denied* (1980), 449 U.S. 912, 66 L. Ed. 2d 140, 101 S. Ct. 285; *Zafft v. Eli Lilly & Co.* (Mo. 1984), 676 S.W.2d 241, *cert. denied sub*

---

[27]Illinois follows this doctrine, but has not done so in product liability cases. *Sklan v. Smolla* (1981), 95 Ill. App. 3d 658, 420 N.E.2d 575; *Jaffray v. Hill* (1963), 41 Ill. App. 2d 460, 191 N.E.2d 399 (both group assault and battery cases).

*nom. E. R. Squibb & Sons, Inc. v. Collins* (1984), 469 U.S. 826, 83 L. Ed. 2d 51, 105 S. Ct. 107; *Martin v. Abbott Laboratories* (1984), 102 Wash. 2d 581, 689 P.2d 368.) The pleadings and affidavits here indicate that the joint submission of clinical data in 1941 for FDA approval of DES for nonpregnancy-related purposes is distinct from the 1947 application process which preceded FDA approval of the drug to treat accidents of pregnancy.[28] While defendants engaged in a significant amount of parallel activity in producing and marketing DES for use in pregnancy, we hold that it does not rise to the level of concerted action.

We also note that the principles underlying the concerted action theory make it inappropriate in a DES setting. Concerted action is normally applied to situations where, unlike this DES case, a specific defendant is already identified as causing the plaintiff's harm and the plaintiff wishes to extend liability to others acting with that defendant. (Comment, *Overcoming the Identification Burden in DES Litigation: The Market Share Liability Theory*, 65 Marq. L. Rev. 609, 618 (1982).) The theory rarely has been utilized to help plaintiffs overcome the identification burden in product liability cases (Note, *DES: Judicial Interest Balancing and Innovation*, 22 B.C.L. Rev. 747, 759-60 (1981)), and we decline to do so here.

Additionally, plaintiff's representation that "[t]he liability of the pharmaceutical industry for this joint conduct has been recognized by several Supreme Courts in other jurisdictions" is inaccurate. Her reliance on four decisions from California, New York, Wisconsin, and Washington is patently misplaced. In two of these jurisdictions, courts found in favor of defendants on plaintiffs' claims of concerted action. (*Collins v. Eli Lilly & Co.* (1984), 116 Wis. 2d 166, 342 N.W.2d 37,

---

[28]Of those companies which participated in the activities of 1941, only Abbott Laboratories, Eli Lilly & Co., and E. R. Squibb & Sons, Inc., filed NDAs in 1947 and 1948 seeking FDA approval of DES for pregnant women. None of those or other applications refer to the 1941 master file. Instead, each application sets forth its own, individual collection of clinical data on use of the drug to treat pregnant women. As stated in the unrebutted affidavit of Dr. Don Carlos Hines of Eli Lilly & Co., who participated in the preparation of Lilly's 1947 supplemental NDA: "In the course of collecting information for the Supplemental NDA I never consulted with representatives of any other drug companies, nor did I ever obtain any material or information from any of them. Lilly worked independently of all other drug companies, and I am not aware of any collaboration among any other companies that sought permission to market diethylstilbestrol for accidents of pregnancy." Moreover, the record is devoid of any indication that other companies that later marketed DES had any connection with the earlier filings, or even that they had any specific knowledge of their contents.

*cert. denied sub nom. E. R. Squibb & Sons, Inc. v. Collins* (1984), 469 U.S. 826, 83 L. Ed. 2d 51, 105 S. Ct. 107; *Martin v. Abbott Laboratories* (1984), 102 Wash. 2d 581, 689 P.2d 368.) In the third, the court held that pleadings nearly identical to plaintiff's here were, as a matter of law, insufficient to state a claim for concerted action. (*Sindell v. Abbott Laboratories* (1980), 26 Cal. 3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, *cert. denied* (1980), 449 U.S. 912, 66 L. Ed. 2d 140, 101 S. Ct. 285.) In the last instance, the court evidently did not even reach the merits of the issue. *Bichler v. Eli Lilly & Co.* (1982), 55 N.Y.2d 571, 436 N.E.2d 182; see *Kaufman v. Eli Lilly & Co.* (1985), 65 N.Y.2d 449, 456, 482 N.E.2d 63, 67-68, 492 N.Y.S.2d 584, 589 (the court of appeals stated that "we expressed no view in *Bichler* and, express none now, on which of the proposed theories—concerted action \*\*\*, if any, should be adopted in this or similar DES cases").

■■■ A second theory upon which plaintiff relies is a variant of the concerted action theory known as "enterprise liability,"[29] first advanced in *Hall v. E. I. Du Pont Nemours & Co.* (E.D.N.Y. 1972), 345 F. Supp. 353. In *Hall*, the plaintiffs sued six blasting cap manufacturers, which comprised virtually the entire blasting cap industry in the United States, and their trade association for 18 separate accidents in which children were injured while playing with unlabeled blasting caps. Evidence identifying the manufacturers of the caps was destroyed in the explosions. The plaintiffs attempted to overcome this problem by alleging that the failure of the blasting cap industry as a whole to place a warning on individual blasting caps created an unreasonable risk of harm which resulted in the plaintiffs' injuries. In holding that the defendants were not entitled to a dismissal for plaintiffs' failure to state a claim, the court reasoned that their adherence to industry-wide safety standards and delegation of design and safety functions to a trade association could support a finding that the defendants jointly controlled the risk of harm.

The facts in this DES case in no way suggest application of *Hall's* theory of joint liability.[30] First, in *Hall*, there were six manufacturers

---

[29]Illinois has not adopted enterprise liability. The "enterprise theory" mentioned in *Hebel v. Sherman Equipment* (1982), 92 Ill. 2d 368, 378-79, 442 N.E.2d 199, 204-05, is a doctrine by which a nonmanufacturing trademark holder can be held liable for the defects of a product to which he holds the trademark.

[30]Courts have generally rejected this theory on the ground that enterprise liability as described in *Hall* is predicated upon industrywide cooperation of a much greater degree than occurred among DES manufacturers. See, *e.g.*, *Martin v. Abbott Laboratories* (1984), 102 Wash. 2d 581, 599-600, 689 P.2d 368, 380; *Collins v. Eli Lilly & Co.* (1984), 116 Wis. 2d 166, 186-87, 342 N.W.2d 37, 47, *cert. denied sub nom.*

in the industry, while the DES industry is comprised of more than three hundred companies. Indeed, *Hall* specifically cautioned against its application to a "decentralized" industry with numerous numbers. (345 F. Supp at 378.) Second, members of the DES industry did not delegate control or responsibility for safety functions to a trade association. Instead, the FDA exercised pervasive regulation and control. *Sindell v. Abbott Laboratories* (1980), 26 Cal. 3d 588, 609-10, 607 P.2d 924, 935, 163 Cal. Rptr. 132, 143-44, *cert. denied* (1980), 449 U.S. 912, 66 L. Ed. 2d 140, 101 S. Ct. 285.

■■ Plaintiff next invokes the theory of civil conspiracy, another variant of concerted action, alleging that defendants engaged in cooperative marketing and a promotional scheme by active agreement and acquiescence to misrepresentations of the benefits of DES. A civil conspiracy is defined as "a combination of two or more persons to accomplish by concerted action either (1) a lawful purpose by unlawful means, or (2) an unlawful purpose by lawful means." (*Maimon v. Sisters of the Third Order of St. Francis* (1986), 142 Ill. App. 3d 306, 311, 491 N.E.2d 779, 783-84.) Plaintiff alleges that defendants conspired to obtain FDA approval of DES in 1941 and then carried the conspiracy into gaining FDA approval in 1947 and 1948 for use of DES in problem pregnancies. The drug companies then used this approval to misrepresent to consumers, including plaintiff's mother, that DES was safe and efficacious for use in pregnancy.

We believe that such an action cannot be maintained on the allegations made in the present case. As we commented earlier, drug companies engaged in parallel conduct in 1941 and 1947, but parallelism alone cannot establish agreement. (*Collins v. Eli Lilly & Co.* (1984), 116 Wis. 2d 166, 188, 342 N.W.2d 37, 47-48, *cert. denied sub nom. E. R. Squibb & Sons, Inc. v. Collins* (1984), 469 U.S. 826, 83 L. Ed. 2d 51, 105 S. Ct. 107.) There is nothing in the record to indicate that defendants acted jointly to gain FDA approval so that they then could collaborate to misrepresent the benefits of DES for use in preventing miscarriages. Even assuming that there was sufficient cooperation in 1941 to constitute an agreement, we cannot conclude that such an agreement extended to the supplemental NDAs filed in 1947 and 1948. Moreover, this theory becomes even more untenable when we consider that many drug companies entered the DES market long after FDA approval. Clearly, these later entrants should not be attrib-

---

*E. R. Squibb & Sons, Inc. v. Collins* (1984), 469 U.S. 826, 83 L. Ed. 2d 51, 105 S. Ct. 107; *Morton v. Abbott Laboratories* (M.D. Fla. 1982), 538 F. Supp. 593, 598; *Ryan v. Eli Lilly & Co.* (D.S.C. 1981), 514 F. Supp. 1004, 1017-18.

uted with participation in or knowledge of the alleged 1941 and 1947 conspiracies. *Collins v. Eli Lilly & Co.* (1984), 116 Wis. 2d 166, 188, 342 N.W.2d 37, 48, *cert. denied sub nom. E. R. Squibb & Sons, Inc. v. Collins* (1984), 469 U.S. 826, 83 L. Ed. 2d 51, 105 S. Ct. 107.

■■■ Finally, although plaintiff's second-amended complaint does not specifically allege the theory of alternative liability, we will nevertheless address its viability in the DES context as it was argued extensively in plaintiff's brief. The alternative liability theory is classically illustrated by *Summers v. Tice* (1948), 33 Cal. 2d 80, 199 P.2d 1. Under this theory, when all defendants, although acting independently, have breached a duty of care toward the plaintiff but only one of them caused the injury, each defendant must prove he did not cause the plaintiff's injury or be held jointly and severally liable with all other defendants. In effect, the burden of proof as to causation shifts to each defendant to prove his innocence.

Again, we agree with the majority of courts that have concluded that strict application of the alternative liability theory "does not present a viable theory for DES cases." (*Collins v. Eli Lilly & Co.* (1984), 116 Wis. 2d 166, 183, 342 N.W.2d 37, 46, *cert. denied sub nom. E. R. Squibb & Sons, Inc. v. Collins* (1984), 469 U.S. 826, 83 L. Ed. 2d 51, 105 S. Ct. 107; *Martin v. Abbott Laboratories* (1984), 102 Wash. 2d 581, 595, 689 P.2d 368, 377. See also *Morton v. Abbott Laboratories* (M.D. Fla. 1982), 538 F. Supp. 593, 598-99; *Namm v. Charles E. Frosst & Co.* (1981), 178 N.J. Super 19, 34, 427 A.2d 1121, 1128; *Zafft v. Eli Lilly & Co.* (Mo. 1984), 676 S.W.2d 241, 244-45.) First, the theory is, in part, based on the assumption that the defendants will be "in a far better position [than the plaintiff] to offer evidence to determine which one caused the injury." (*Summers v. Tice* (1948), 33 Cal. 2d 80, 86, 199 P.2d 1, 4.) In the present case, both parties have difficulties obtaining information about DES production and marketing. Second, the alternative liability doctrine contemplates that all defendants who could have possibly injured the plaintiff are before the court. Thus, the court is assured that at least one of the defendants was directly responsible for the plaintiff's harm. In a DES case, on the other hand, there are potentially hundreds of defendants who could be liable, and consequently, the likelihood that any one of them caused the harm may be correspondingly small. (See *Sindell v. Abbott Laboratories* (1980), 26 Cal. 3d 588, 602-03, 607 P.2d 924, 931, 163 Cal. Rptr. 132, 139, *cert. denied* (1980), 449 U.S. 912, 66 L. Ed. 2d 140, 101 S. Ct. 285.) Third, the alternative liability approach does not, in its pure form, provide an equitable method of apportioning damages among manufacturers. Defendants that manufactured little DES and those that manufactured

much would be equally liable. Unmodified, therefore, the *Summers* rule is ultimately unsuitable in the DES context.

■■■ Plaintiff, however, relying on a single statement by Abbott Laboratories that it may be obliged to supplement its answers to interrogatories in the future, argues that any lack of evidence regarding the theories alleged in counts I through VIII is due to incomplete discovery. Such a contention is without merit. Plaintiff did not seek further discovery following the joint and individual motions for summary judgment, although there was ample opportunity to do so; she did not request a continuance in order to gather additional facts, and she did not file any affidavit under Supreme Court Rule 191(b) (107 Ill. 2d R. 191(b)), stating that she was unable to obtain any relevant evidence. Under these circumstances, plaintiff may not now assert that additional disclosure was required. See *Kimbrough v. Jewel Cos.* (1981), 92 Ill. App. 3d 813, 416 N.E.2d 328.

■■■ We now turn to whether cross-appellees' individual motions for summary judgment were properly granted as to all counts of plaintiff's second amended complaint on the ground that they did not produce or market the DES in question.[31] While cross-appellees presented exculpatory affidavits, deposition testimony and interrogatories in support of these motions, plaintiff offered no counteraffidavits or testimony to rebut them. The law is well established that when facts contained in affidavits and other documents supporting a motion for summary judgment are not contradicted by counteraffidavit, such facts are admitted and must be taken as true for purposes of the motion. *Fooden v. Board of Governors of State Colleges & Universities* (1971), 48 Ill. 2d 580, 272 N.E.2d 497, *cert. denied* (1972), 408 U.S. 943, 33 L. Ed. 2d 766, 92 S. Ct. 2847; *Koukoulomatis v. Disco Wheels, Inc.* (1984), 127 Ill. App. 3d 95, 468 N.E.2d 477.

■■■ As nonmanufacturers of the offending product, therefore, cross-appellees are not subject to liability under any of the theories advocated by plaintiff. Even in *Sindell*, the primary authority upon which plaintiff relys in support of market share liability, the court stated: "Each defendant will be held liable for the proportion of the judgment represented by its share of that market *unless it demonstrates that it could not have made the product which caused plaintiff's injuries.*" (Emphasis added.) (*Sindell*, 26 Cal. 3d at 612, 607 P.2d at 937, 163 Cal. Rptr. at 145.) In fact, plaintiff herself concedes that nonmanufacturers of the injury-causing DES may not properly be

---

[31]Cross-appellees Sterling Drug, Inc., and Breon Laboratories, Inc., maintain that they did not even manufacture DES.

held liable under count X of her second-amended complaint.[32]

Even those cases cited by plaintiff in support of the theories alleged in counts I through VIII would not subject cross-appellees, as non-manufacturers, to liability. For example, in *Martin v. Abbott Laboratories* (1984), 102 Wash. 2d 581, 605, 689 P.2d 368, 382, the court stated:

> "Individual defendants are entitled to exculpate themselves from liability by establishing, by a preponderance of the evidence, that they did not produce or market the particular type DES taken by the plaintiff's mother ***."

Similarly, in *Collins v. Eli Lilly & Co.* (1984), 116 Wis. 2d 166, 194-98, 342 N.W.2d 37, 50-52, *cert. denied sub nom. E. R. Squibb & Sons, Inc. v. Collins* (1984), 469 U.S. 826, 83 L. Ed. 2d 51, 105 S. Ct. 107, the court remarked:

> "[T]he plaintiff need only establish by a preponderance of the evidence that a defendant produced or marketed the *type* (e.g., color, shape, markings, size, or other identifiable characteristics) of DES taken by the plaintiff's mother ***.
>
> ***
>
> Once the plaintiff has proven a *prima facie* case *** the burden of proof shifts to the defendant to prove by a preponderance of the evidence that it did not produce or market the subject DES either during the time period the plaintiff was exposed to DES or in the relevant geographical market area in which the plaintiff's mother acquired the DES. In utilizing these defenses, the defendant must establish that the DES it produced or marketed could not have reached the plaintiff's mother."

---

[32]Plaintiff repeatedly cites with approval the trial court's action in dismissing those defendants who did not supply the subject DES when she states, at page 33 of her brief:

> "In the instant case, plaintiff is able to identify a specific form and dosage of DES. On that basis, the trial court permitted certain manufacturers to remove themselves as potential members of this particular 'market' and restrict the number of defendants to those who produced this particular form and dosage of DES at the time and in the area applicable to Elizabeth Smith."

And at page 36, plaintiff comments:

> "Manufacturers who did not make DES in the form and dosage taken by Elizabeth Smith were quickly eliminated as defendants in this case."

Finally, at page 44 of her brief, plaintiff states:

> "[T]he defendants now before this Court each marketed DES in a form and dosage identified by Elizabeth Smith as that which she was prescribed by the Field Clinic during the early 1950s."

In light of the above authority and the uncontroverted facts in the record, summary judgment in favor of cross-appellees was appropriate.

In sum, we affirm the trial court's denial of summary judgment to defendants on count X alleging strict liability, but reverse the grant of summary judgment in favor of defendants on count IX alleging negligence. All remaining grants of summary judgment are affirmed.

We remand to the trial court to proceed in accordance with the provisions of this opinion.

Affirmed in part; reversed in part and remanded.

SCARIANO and MURRAY, JJ., concur.