**UNIVERSITY SYSTEM OF NEW HAMPSHIRE**

v.

**UNITED STATES GYPSUM COMPANY; Pfizer Minerals, Pigment and Metals Division, Charles Pfizer & Co., Inc.; Keene Corporation.**

**Civ. No. 84–716–D.**

United States District Court,
D. New Hampshire.

Jan. 17, 1991.

Michael Hall, Manchester, N.H., for plaintiff.

Stephen G. Hermans, Exeter, N.H., for U.S. Gypsum Co.

Kenneth M. Brown, Nashua, N.H., for Pfizer Minerals Pigment and Metals Div., Charles Pfizer & Co., Inc.

Michael A. Pignatelli, Concord, N.H., for Keene Corp.

## OPINION AND ORDER

DEVINE, Chief Judge.

This diversity action is brought by University System of New Hampshire ("USNH") on claims of negligence, strict liability, misrepresentation, conspiracy, enhanced damages, and alternative, market share, and risk contribution liability.[1] USNH seeks to recover from defendants United States Gypsum Company ("USG"), Pfizer Minerals, Pigment and Metals Division, Charles Pfizer & Co., Inc. ("Pfizer"), and Keene Corporation ("Keene")[2] the costs associated with removal of asbestos-containing products from many USNH buildings.

Presently before the court are several dispositive motions filed by various defendants.[3] The court will address them individually.

1. Counts of express and implied warranty and continuing nuisance, trespass, restitution, and indemnity were previously dismissed.

2. USNH originally named 28 defendants in this action. Through settlements, dismissals, and stays pending bankruptcy, only the above-named defendants remain.

3. On June 13, 1990, the clerk of court ordered defendants to file a list of pending motions. Such a list was filed on July 11, 1990, with motions divided into "Dispositive", "Discovery", and "Evidentiary" categories. This order addresses only the dispositive motions on that list, with the exception of those filed by defendants who are no longer part of this litigation.

4. USNH buildings are located at Keene State College, Plymouth State College, the University of New Hampshire (Durham), Merrimack Val-

## BACKGROUND

USNH owns and operates approximately 150 buildings located throughout New Hampshire.[4] It claims that many of these buildings contain asbestos-containing products manufactured by defendants, including ceiling products and thermal (pipe and boiler) insulation.[5] USNH claims that defendants' products release asbestos fibers which cause cancer, impair lung function, and result in other deadly diseases. The asbestos products have released and continue to release asbestos fibers which have resulted in damage to USNH's buildings by contaminating the air, walls, floors, etc. Plaintiff claims it must remove or contain the asbestos products to prevent those who use USNH buildings from being exposed. USNH further alleges that defendants knew or should have known of the dangers of asbestos as early as the 1930s and conspired to keep such knowledge from the public.

### I. Motion to Dismiss (document no. 439)

Before the court is the jurisdictional issue raised by defendants' motion to dismiss plaintiff's entire action on the ground that the parties are not diverse. In order to maintain diversity jurisdiction in this court, the plaintiff must plead an amount in controversy as required by the statute and must plead complete diversity of citizenship between plaintiff and all defendants. 28 U.S.C. § 1332(a).[6]

ley College (Manchester), the Dunlop Center and School of Lifelong Learning (Lee), and other locations.

5. The court previously has ordered separate trials for: surface treatment products (ceiling materials, including acoustical plaster; ceiling tile and texture finishes; and fireproofing); thermal system insulation (pipe and boiler); and floor tile. All floor tile claims have been settled or dismissed. Defendants U.S. Gypsum and Pfizer are involved in Phase I (ceiling), and Keene Corporation is in Phase II (pipe and boiler).

6. At the time this suit was initiated, 28 U.S.C. § 1332 read, in pertinent part:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of

■ For purposes of this motion, the amount in controversy is not at issue. The issue is whether USNH is a citizen of the state of New Hampshire for the purposes of diversity jurisdiction. Defendants argue that USNH is a mere "arm" or "alter ego" of the state, and as such cannot be a citizen of New Hampshire for the purpose of diversity jurisdiction. Plaintiff USNH contends that under New Hampshire Revised Statutes Annotated ("RSA") 187–A:1, it was established as a "body politic and corporate," [7] and thus, although it is a political subdivision of the state, it is not an "alter ego" of the state, and is therefore a citizen.

It is well settled "that a State is not a 'citizen' for purposes of diversity jurisdiction." *Moor v. County of Alameda,* 411 U.S. 693, 717, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973); *Northeast Federal Credit Union v. Neves,* 837 F.2d 531, 533 (1st Cir.1988) (quoting *Postal Telegraph Cable Co. v. Alabama,* 155 U.S. 482, 487, 15 S.Ct. 192, 194, 39 L.Ed. 231 (1894)); *University of R.I. v. A.W. Chesterton Co.,* 721 F.Supp. 400, 401 (D.R.I.1989). It is equally well settled that a political subdivision of a state is a citizen of the state for diversity purposes unless it is "simply 'the arm or alter ego of the State.'" *Moor, supra,* 411 U.S. at 694, 93 S.Ct. at 1788 (quoting *State Highway Comm'n of Wyoming v. Utah Constr. Co.,* 278 U.S. 194, 199, 49 S.Ct. 104, 106, 73 L.Ed. 262 (1929)); *George R. Whitten, Jr., Inc. v. State Univ. Constr. Fund,* 493 F.2d 177, 179 n. 2 (1st Cir.1974); *University of R.I., supra,* 721 F.Supp. at 401.

Counties, municipalities, and, usually, local school districts are classified as political subdivisions, not arms of the state, and therefore are citizens for the purpose of diversity jurisdiction. *See generally* Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 2d* § 3524, at 130, 133. State agencies are not as easily classified. *Id.* at 134.

In the context of the Eleventh Amendment, for instance, the classification of a public agency or institution "depends upon whether the entity 'is to be treated as an arm [or alter ego] of the state partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.'" *Ainsworth Aristocratic Int'l Pty. Ltd. v. Tourism Co. of the Commonwealth of P.R.,* 818 F.2d 1034, 1036 (1st Cir.1987) (quoting *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977)); *Rodriguez Diaz v. Sierra Martinez,* 717 F.Supp. 27, 29 (D.P.R.1989) (citations omitted). The determinative factor when a state organization is a party to a suit in federal court is whether the state is the real party in interest. *Neves, supra,* 837 F.2d at 533 (citations omitted); *Whitten, supra,* 493 F.2d at 179; *University of R.I., supra,* 721 F.Supp. at 401. *See also State Highway Comm'n of Wyoming, supra,* 278 U.S. at 199–200, 49 S.Ct. at 105–106.

The test to determine the real party in interest is "pretty much the same" whether used to determine diversity jurisdiction, *Neves, supra,* 837 F.2d at 534, to determine whether a state is "'entitled to invoke its sovereign immunity,'", *id.* (quoting *Ford Motor Co. v. Department of Treasury of Indiana,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945)), or to determine whether an agency "'is sufficiently an arm of the state to qualify for the protection of the Eleventh Amendment,'" *id.* (quoting *Paul N. Howard Co. v. Puerto Rico Aqueduct Sewer Auth.,* 744 F.2d 880, 886 (1st Cir.1984), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985)).

Courts in this circuit have primarily considered the following factors in determining whether a state agency is an arm of the state:

---

$10,000, exclusive of interest and costs, and is between—

 (1) citizens of different states; ....

**7.** Although not defined in the statute, the phrase "body politic and corporate" is also found in

RSA 31:1, which states, "Every town is a body corporate and politic and by its corporate name may sue and be sued, prosecute and defend, in any court or elsewhere."

Whether it performs a government function, whether it functions with substantial autonomy, to what extent it is financed independently of the state treasury, and if a judgment sought to be entered against the [entity] will be satisfied out of the state treasury.

*In re San Juan Dupont Plaza Hotel Fire Litigation,* 888 F.2d 940, 942 (1st Cir.1989) (citations omitted). *Accord Ainsworth, supra,* 818 F.2d at 1037; *Whitten, supra,* 493 F.2d at 179–80; *University of R.I., supra,* 721 F.Supp. at 401–02; *Rodriguez Diaz, supra,* 717 F.Supp. at 29; *Vanlaarhoven v. Newman,* 564 F.Supp. 145, 148 (D.R.I. 1983). Other relevant factors considered by the courts include:

Whether the entity "has been separately incorporated; ... whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the [entity's] operations."

*In re San Juan, supra,* 888 F.2d at 942 (quoting *Ainsworth, supra,* 818 F.2d at 1037). No one of these factors is considered conclusive. *Ainsworth, supra,* at 1037. However, "[t]he entity's financial and operational autonomy is often one of the most significant of the factors." *Id.* at n. 4

With sufficient autonomy from the state, especially with regard to financial matters, an agency, political subdivision, or state university is the real party in interest and is thus a "citizen" for the purposes of diversity jurisdiction. *See University of R.I., supra,* 721 F.Supp. at 403 (state university with "a considerable amount of economic and operational authority" is a citizen, not an alter ego of the state); *Howard supra,* 744 F.2d at 886 (suggesting that "[a]n autonomous governmental corporation" is not an alter ego of the state because it is financially independent even though it received periodic appropriations from the state treasury). *But see In re San Juan, supra,* 888 F.2d at 943 (state agency that received more than 70 percent of a recent annual budget from general

funds of Puerto Rico and whose policies are under significant control by the governor's office found to be so financially and politically dependent upon the Commonwealth as to be an arm of it); *Whitten, supra,* at 181 (university construction fund, with "no financial independence of its own", was held to be an alter ego of the state); *Perez v. Rodriguez Bou,* 575 F.2d 21, 25 (1st Cir.1978) (extent and nature of the Commonwealth of Puerto Rico's financial support for the University of Puerto Rico was a dispositive factor in concluding that the university was an "arm" of the state).

Defendants urge the court to rely on the analysis and result in an opinion by the United States District Court for the District of South Carolina in which Clemson University's class action suit against a number of asbestos manufacturers was dismissed for lack of diversity jurisdiction. Defendants' Motion to Dismiss at Exhibit I, *Clemson Univ. & the College of Charleston v. W.R. Grace,* No. 86–2055–2 (D.S.C. July 15, 1988). But as *Clemson* points out, "[e]ach state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances." *Id.* at 4 (citing *Soni v. Board of Trustees of Univ. of Tenn.,* 513 F.2d 347, 352 (6th Cir.1975)). Considering similar factors as those adopted by the First Circuit, the court concluded that Clemson University did not have enough financial and operational autonomy to escape an alter ego characterization. At Clemson, six of the members of the Board of Trustees are elected by the General Assembly, *Clemson, supra,* at 11; there are limits on the Board's ability to dispose of some property and buildings, *id.* at 12; its programs of study are governed by the State Commission on Higher Education and the General Assembly, *id.* at 13; no new program can be undertaken without the approval of the Commission or the General Assembly, *id.* at 14; and the Commission adopts or modifies the university's annual line-item budget prior to submission to the State Budget and Control Board and the General Assembly, *id.* at 15. In addition, the State Board must approve Clemson's

tuition, *id.* at 15–16, and all tuition must be remitted to the State Treasurer, *id.* at 16.

In New Hampshire, however, "the general court has delegated broad authority to the board of trustees who shall be responsible for managing the university system" and protect the university system "from inappropriate external influence." RSA 187–A:2–b II. Defendants make much of appropriations from the state for asbestos-abating activities that have been made over the years, at the request of USNH trustees, to illustrate USNH's financial dependence on the state. Defendants' Motion to Dismiss at 5–6. This argument misconstrues the nature of the court's inquiry. As the court in *Howard* made clear, it is the autonomy of the governmental corporation which is scrutinized; the focus is on the *agency's* position vis-a-vis the state, not the characterization of a particularized undertaking of that agency. *Howard, supra,* at 886.

Although USNH does receive periodic appropriations from the state treasury, "the state [only] contributes approximately 25 percent [of the] total expenses of the University System." Defendants' Motion to Dismiss, Section II, Deposition of Bradford Perry, Chief Financial Officer of USNH at 21; Plaintiff's Objection to Motion to Dismiss.

New Hampshire receives a very low percentage of its total dollars from the state and an offsetting high percentage of dollars from its tuition. That's the way the state has deemed to operate. That is high and low relative to other state university systems.

*Id.* Further, the state does not have approval power over the entire operating budget of USNH, nor does it approve the line item budget. Instead, the state approves only its portion of the budget, leaving to USNH the power to "change that budget any way we want. ... We're independent of the legislature in terms of operating the System." *Id.* at 25; Plaintiff's Objection to Motion to Dismiss, Deposition of James S. Yakovakis, member of USNH Board of Trustees, at 49. With regard to the capital budget, the legislature approves the total

amount, but not the priorities as to how it is spent. Yakovakis Deposition at 50. Additionally, with regard to financial matters, the legislature has no authority over the tuition charged, *id.* at 51; money from tuition does not go to the state, *id.* at 71; the trustees are authorized to transfer funds among the institutions of the system, RSA 187–A:16 XV; and any amount remaining to the credit of USNH at the close of the fiscal year is carried over, not returned to the state treasury, RSA 187–A:7 III. "[I]ncome received ... from all other sources, including bequests, trusts, income from bequests and trusts, student fees and tuition charges, rents, sales, and any other income ... shall be retained by ... the University System and be used in such manner as the trustees determine or as is provided by law or by the conditions incident to trusts, gifts, or bequests." RSA 187–A:21. The auxiliary activities at USNH, which include the housing facilities, dining halls, student unions, and bookstores, generate substantial income, creating enough revenue to meet expenses. RSA 187–A:16 XXII; Perry Deposition at 28. These provisions, taken together, give the Board of Trustees and USNH a considerable amount of economic and operational authority.

Defendants assert, however, that USNH is significantly controlled by the legislature. They argue that "comprehensive regulation of every aspect of USNH," Defendants' Motion to Dismiss at 10, precludes sufficient autonomy from the state to confer citizenship status upon USNH. Defendants would have the court deem USNH an alter ego of the state because it exists by statute as a state agency and because past behavior of the University of New Hampshire, a component of the University System, has been found to be state action for purposes of 42 U.S.C. § 1983. *See Martin–Trigona v. University of N.H.,* 685 F.Supp. 23, 24 (D.N.H.1988). Again, the court is not persuaded. It is the trustees who have management and control of all property and affairs of USNH, not the legislature. RSA 187–A:16. As the First Circuit has made clear, it is not agency status *per se* that gives rise to the alter

ego designation; the crucial question is the agency's degree of autonomy from the state. *Neves, supra,* 837 F.2d at 534; *Howard, supra,* 744 F.2d at 886; *University of R.I., supra,* 721 F.Supp. at 401. While there are provisions for legislative oversight, that oversight is more in the nature of review, study, and awareness of the activities and needs of the system, not control. RSA 187–A:2–b I; RSA 187–A:26. *See generally* RSA 187–A:16 (authority of trustees).

USNH maintains considerable operational control beyond the financial matters discussed *inter alia.* It owns the real estate upon which the campuses are situated, Yakovakis Deposition at 69; and it can generally sell or acquire real estate on its own or with the trustees' approval, not the legislature's, *Id.* at 70–71. Additionally, beyond the legislative mandate to provide certain types of programs, e.g., an agricultural and forestry school, the State of New Hampshire does not get involved in approving or disapproving educational programs or curricula. *Id.* at 72.

Based on its review of the status of USNH vis-a-vis the State of New Hampshire, the court finds that USNH is a governmental corporation of sufficient autonomy to escape designation as an alter ego of the state. USNH is therefore a citizen of New Hampshire, subject to the diversity jurisdiction of the federal court.

Accordingly, defendants' motion to dismiss (document no. 439) is denied.

## II. Motion for Summary Judgment (document no. 438)

All defendants also move for summary judgment, alleging that plaintiff's entire cause of action is barred under the state statute of limitations.

Plaintiff filed this suit on November 9, 1984. Defendants maintain that the cause of action accrued prior to November 9, 1978, and is therefore time barred by RSA 508:4 I.

### A. Accrual of a Cause of Action

New Hampshire's statute of limitations for actions sounding in tort, RSA 508:4 I, provides in relevant part that "personal actions ... may be brought only within 6 years of the time the cause of action accrued."[8] The statute does not define "accrued". Therefore, the point at which a cause of action accrues is a question for judicial determination. *Gagnon v. G.D. Searle & Co.,* 889 F.2d 340 (1st Cir. 1989); *Raymond v. Eli Lilly & Co.,* 117 N.H. 164, 371 A.2d 170 (1977). While it is well established that a cause of action accrues at the time damages occur, *Premium Management, Inc. v. Walker,* 648 F.2d 778 (1st Cir.1981); *Roberts v. Richard & Sons, Inc.,* 113 N.H. 154, 304 A.2d 364 (1973), this general rule is based on the "usual" tort action whereby causation and the resultant harm occur simultaneously, thus putting the claimant on immediate notice of any injury. *See generally, Raymond, supra.* However, where plaintiff experiences some delay between infliction of the harm and recognition of the corresponding injury, injustice would result from the rigid application of this general rule in depriving plaintiff of a claim before it was or should have been aware of the injury. *Shillady v. Elliot Community Hosp.,* 114 N.H. 321, 320 A.2d 637 (1974). Accordingly, most states, including New Hampshire, have developed a "discovery rule." In the instant case, it would be unjust to adopt the general rule in torts and hold that plaintiff had knowledge of its injury dating from the point when the asbestos-containing products were installed. This court therefore finds New Hampshire's discovery rule should apply to determine the point at which plaintiff's cause of action accrued.

### B. The Discovery Rule

"New Hampshire has not been entirely consistent in its definition of the discovery rule." *Gagnon, supra,* 889 F.2d at 342. Indeed, "one might read several discovery rule cases and conclude that the courts are

---

**8.** Section 508:4 has since been amended to allow only three years for personal actions arising on or after July 1, 1986. RSA 508:4 (Supp.1988).

applying two substantively distinct rules." *Raymond, supra,* 117 N.H. at 170, 371 A.2d 170. The parties to this action cite different versions of the discovery rule. Defendant argues that this court should apply the language used most recently in *Rowe v. John Deere,* 130 N.H. 18, 21, 533 A.2d 375 (1987), stating the discovery rule as follows:

> A cause of action will not accrue ... until the plaintiff discovers or in the exercise of reasonable diligence should have discovered not only that he has been injured but also that his injury may have been caused by the defendants' conduct.

Plaintiff, on the other hand, cites the discovery rule as articulated in *Brown v. Mary Hitchcock Mem. Hosp.,* 117 N.H. 739, 378 A.2d 1138 (1977), holding that a cause of action does not accrue until plaintiff knows of its harm, knows the defendant caused it, and knows the defendant's conduct was "wrongful".

Although *Brown* has not been overturned, this court can find no case law following *Brown* in which the New Hampshire Supreme Court has stated the discovery rule to expressly require plaintiff's discovery of his injury as inflicted by defendant's wrongful conduct. Indeed, the New Hampshire Supreme Court has apparently retreated to its pre-*Brown* articulation of the rule, requiring only discovery of injury and its cause. *Rowe, supra,* 130 N.H. 18, 533 A.2d 375; *Wolf Investments, Inc. v. Town of Brookfield,* 129 N.H. 303, 529 A.2d 861 (1987); *Bricker v. Putnam,* 128 N.H. 162, 512 A.2d 1094 (1986); *Opinion of the Justices,* 126 N.H. 554, 493 A.2d 1182 (1985); *French v. R.S. Audley, Inc.,* 123 N.H. 476, 480, 464 A.2d 279 (1983); *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980).

■ Moreover, application of the discovery rule to damages involving property, as in the present case, has been directly addressed by the New Hampshire Supreme Court. In *French, supra,* plaintiff, a landowner, sued an abutting landowner for willful trespass. In an interlocutory appeal from the superior court, the Supreme Court addressed the issue of whether the discovery rule should be extended to apply in actions to recover damages to property. The court affirmed the pre-*Brown* version of the discovery rule, stating, "a cause of action *involving harm to property* will not accrue under the discovery rule until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only that he has been injured, but also that his injury may have been caused by defendant's conduct." *Id.* 123 N.H. at 480, 464 A.2d 279 (emphasis added).

Accordingly, this court concludes that the discovery rule as stated in *French* articulates state law for ascertaining the point of accrual for plaintiff's cause of action in the case at bar.

**C. Application of the Discovery Rule**

■ Applying the discovery rule, the court must therefore consider (1) whether plaintiff had, or in the exercise of reasonable diligence should have had, knowledge of its injury, and (2) whether it had knowledge linking that injury to the conduct of the defendants. Here, plaintiff's knowledge of the causal relationship between its injuries and defendants' alleged misconduct is not at issue. The question before the court is when USNH discovered or reasonably should have discovered its injury. Plaintiff alleges that it "did not discover and did not have a reasonable opportunity to fully discover the dangers of defendants' asbestos products and the need to remove or otherwise abate them until recently." Complaint at 6. Accordingly, plaintiff asserts that its injury did not accrue until it learned of the presence of asbestos in USNH buildings, that particular asbestos products were hazardous, and that it would be necessary to remove or otherwise abate those products.

Defendants argue that USNH knew or by the exercise of reasonable diligence should have known of their injury prior to November 9, 1978. Defendants, relying on the following course of events, maintain that three "key players" at Keene State College ("KSC") knew or reasonably should have known of the presence of asbestos

and the corresponding health threat prior to 1978, and that this knowledge should be imputed to the entire university system. In their depositions and internal memos, Dr. Stephen Stepenuck, Wayne Wyman, and Robert Mallet each acknowledge that they had an understanding, at least as early as 1976, that airborne asbestos fibers generally were hazardous. Stepenuck Deposition at 29, 49; Wyman Deposition at 33; Mallet Deposition at 43. In 1976 the United States Environmental Protection Agency ("EPA") published a news article discussing the "Danger of Asbestos in Offices", which read as follows:

> Yale University removed all the ceilings from its ten-story school of Art and Architecture at New Haven, Connecticut, because the amount of asbestos floating in the air from them reached levels known to cause cancer deaths. The University of California at Los Angeles did the same thing in one of its new dormitories, because students rough-housing in their rooms shook loose the cancer-causing asbestos fibers. "I don't think people in a non-industrial setting, let alone workers, should be exposed to such high levels of asbestos," said Dr. Robert Sawyer, Director of Health Services at Yale, and the man who forced the University to remove the ceilings in its Art and Architecture building. The Yale and UCLA experiences are just two examples of what looms as a major occupational health hazard for millions of American office workers.
>
> A new study by the Mount Sinai School of Medicine's Environmental Sciences Laboratory here found dangerously high levels of asbestos fibers in office buildings around the country. "We are seeing inside the office buildings concentrations that are as high as we saw in areas near asbestos plants, or where spraying was being done—where there has been illness or death," said Dr. William J. Nicholson, who ran the Mount Sinai study. "This significantly increased the risk of cancer to people who work in those buildings on a day-in and day-out basis," he added.
>
> Affected are thousands of buildings put up around the country between 1958 and 1970, in which asbestos replaced concrete as the fire-retarding wrapping for steel beams. By 1970, the large office buildings in the country used asbestos spray. One method was to spray a mixture of asbestos and heater directly on the steel beams. In time, the asbestos fibers come loose and are circulated through the air-conditioning and heating systems. Nicholson estimated that half the new office buildings in the country, and virtually all of the 1,000 buildings put up here between 1958 and 1970, used that method of fire-proofing. The Mount Sinai study checked asbestos levels in nineteen buildings in five cities across the country—New York, Boston, San Francisco, Berkeley, and Chicago. It found little additional contamination in buildings where the asbestos was mixed with light cement before it was sprayed.
>
> Asbestos levels are hard to measure, and there is no known threshold level between safe and unsafe exposure. "We are finding asbestos disease at lower and lower levels," said Nicholson. Nicholson recommended installing filters in buildings to screen out the asbestos fibers. The Environmental Protection Agency, which financed the Mount Sinai study, also is looking into possible solutions.

This news article subsequently came to the attention of Dr. Stephen Stepenuck, a KSC chemistry professor and campus safety official, on February 13, 1976.[9]

Immediately upon reading the EPA article, Dr. Stepenuck sent a memo about the hazards identified in the article to the attention of the Office of the Physical Plant at KSC. Placing particular emphasis on spray-on asbestos fireproofing, Dr. Stepenuck recommended that spray-on fireproofing material being used in the construction of a new library on the KSC campus be inspected to find out if the spray used

9. The record indicates that although not an expert on asbestos health hazards, Dr. Stepenuck was appointed by KSC to attend conferences on occupational health hazards and acted as a campus watchdog on the issue of asbestos hazards.

asbestos. If the application material included asbestos, Dr. Stepenuck recommended that the spray be mixed with cement to prevent "dusting" when the asbestos material eventually dried out. In addition, Dr. Stepenuck suggested that the building specifications on file be inspected to ascertain the possible use of asbestos fireproofing materials in all KSC campus buildings constructed since 1958.

Mr. Wyman, Assistant Director of the Physical Plant, received Dr. Stepenuck's memo and attached a copy of the EPA news article. He shared Dr. Stepenuck's concerns regarding the hazards of airborne asbestos fibers with his supervisor, Mr. Robert Mallet. The Office of the Physical Plant at KSC, under Mr. Mallet's direction, subsequently made an inspection of the library fireproofing materials and reviewed building specifications, but found no use of asbestos fireproofing. Inspection of building ceilings for asbestos was not carried out until October 1980. When such inspection was made at one of the KSC buildings, again no asbestos was found. Mallet Affidavit at ¶ 16. Indeed, plaintiff claims that KSC officials did not become aware of an "asbestos problem" at KSC until the spring of 1981, when the Morrison–Parker Space Allocation Committee recommended removal of asbestos pipe insulation. Defendants, however, conclude that, once on notice that asbestos was potentially hazardous, the head administrators of KSC, and thereby the entire University System should have inspected all their buildings for asbestos-containing products. They allege that the failure to do so was deliberate, and therefore the discovery rule should not toll the statute of limitations.

While there is some force to defendants' argument, the court is unpersuaded. Viewing the facts in the light most favorable to the plaintiff, the court cannot conclude that as a matter of law USNH was on notice prior to November 9, 1978, of an asbestos problem in their buildings yet deliberately remained inactive and indifferent to it until late 1981. Therefore, the court finds plaintiff's cause of action is not time barred and defendants' motion for summary judgment (document no. 438) is denied.

*III. Defendants' Motions for Summary Judgment on Count V (misrepresentation) and Count VI (conspiracy) (document nos. 446, USG; 458, Pfizer; and 549, Keene—all joining no. 445, filed by former defendant National Gypsum Company)*

A. Misrepresentation (Count V)

██ Misrepresentation can be intentional or negligent. Intentional misrepresentation or fraud must be proved by showing that the representation was made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation. *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 662 (1st Cir.1981). The essential elements of negligent misrepresentation are the defendant's negligent failure to exercise care or competence in communicating information. Both fraudulent and negligent misrepresentation require the plaintiff's justifiable reliance upon such information to its detriment. *Ingaharro v. Blanchette*, 122 N.H. 54, 57, 440 A.2d 445 (1982); *Tober's, Inc. v. Portsmouth Housing Auth.*, 116 N.H. 660, 663, 367 A.2d 603, 606 (1976).

██ Defendants contend that USNH's misrepresentation count should be dismissed because USNH fails to show that it received or relied on any representations, negligent or intentional, made by defendants. Defendants argue that without evidence of a misrepresentation via "communication in some form," there can be no reliance by the plaintiff. Defendant's Motion for Summary Judgment on Plaintiff's Misrepresentation and Conspiracy Claims at 4.

USNH admits, in fact, that it did not rely directly on defendants' representations regarding asbestos products, but instead relied on its architects to select products for its buildings. Although such third-party reliance is actionable, USNH is unable to find architects with intact files for USNH products involving asbestos-containing building products, and is therefore unable to provide testimony about the particular

representations on which they allegedly relied to select building products. Plaintiff's Objection to Defendants' Motion for Summary Judgment, Appendix E. The court agrees with defendants that absent evidence of a communicated representation there can be no misrepresentation. *Ingaharro, supra,* 122 N.H. at 57, 440 A.2d at 447.

The inquiry does not stop there, however. In its complaint and its objection to the instant motion, USNH claims the defendants fraudulently concealed known dangers of asbestos. Complaint ¶ 33; Objection to Motion at 37, 38.

 Intentional concealment of a material fact may constitute fraud. *Batchelder v. Northern Fire Lites, Inc.,* 630 F.Supp. 1115, 1118 (D.N.H.1986) (citing *Leclerc v. Prudential Ins. Co. of America,* 93 N.H. 234, 39 A.2d 763 (1944)). For a failure to disclose to rise to the level of actionable fraud, however, there must be a duty to disclose. *Batchelder, supra,* 630 F.Supp. at 1118. A duty to disclose arises when a seller knows of a concealed defect which is unknown to the buyer and not capable of detection by the buyer, provided the defect is dangerous to life or property. *Ingaharro, supra,* 122 N.H. at 57, 440 A.2d at 447.

 Here, USNH alleges that the defendants had actual knowledge of the potential dangers of asbestos and that, despite this knowledge, defendants failed to disclose these dangers. USNH further alleges it relied on defendants' concealment in that, if defendants had not concealed the health hazards of asbestos, USNH would not have used asbestos-containing products in its buildings.

In support of its claim of fraudulent concealment, USNH has submitted evidence to suggest that, for the last thirty years, members of the asbestos industry, including defendants, knew of and kept from the public health risks of its products. Plaintiff's Objection, Section II, Appendix C. For example, plaintiff cites the actions of defendant USG, along with other manufacturers no longer in this suit, with respect to Dr. Leroy Gardner, whom USG retained to study its Jersey City plant. In 1936 Dr. Gardner advised USG "that there is no standard for safe concentration of asbestos dust." Plaintiff's Objection, Appendix C, Tab 5.

Also that year, USG and others sponsored animal experiments by Dr. Gardner to gather data about asbestos-related injuries. Plaintiff's Objection, Appendix C, Tab 7. The report was completed in 1943, and the sponsors later agreed that any references "to cancer and tumors" should be omitted. The sponsors later made public only the "sanitized" report. Plaintiff's Objection, Appendix C, Tab 13.

Plaintiff also calls attention to the involvement of defendant Keene through its membership in the Sprayed Mineral Fibers Manufacturers Association, Inc. ("SMFMA"). Evidence offered by USNH indicates that SMFMA "doctored" experiments and kept from the public reports which indicated dangerous properties of asbestos. Plaintiff's Objection, Appendix C, Tabs 22–31, 40–41.

As evidence of its reliance on defendants' alleged concealment, USNH submits the affidavit of Vincent E. Todd, who was USNH Assistant Director of Physical Plant Development from 1963 to 1971 and Director of Physical Plant Development from 1971 to 1987. Plaintiff's Objection, Appendix B. Todd maintains that through his review of building project specifications and interaction with architects, any information provided about potential dangers of asbestos would have come to his attention and he would have recommended that the university not use the product.

Defendants object to such evidence on two grounds. First, they argue that the Todd Affidavit is "speculation and unsubstantiated assertions that asbestos-containing products would not have been used" if Todd had received information about potential hazards. Defendants' Reply to Plaintiff's Objection at 13. The court, however, reads Todd's statements as supporting plaintiff's claim that if the defendants had not concealed the dangers of asbestos,

USNH would have relied on that information and acted differently.

Second, defendants argue that Todd's affidavit is inadmissible under Rule 56(e), Fed.R.Civ.P., in that it runs afoul of the requirement that an affiant have personal knowledge of the facts about which he is testifying. Defendants' Reply at 5, 6, 11. Defendants, however, ignore the thrust of the fraudulent concealment claim. Since Todd attests to what *he* would have done if the allegedly concealed information had been made available, the argument that he lacks personal knowledge fails. As a reasonable mind could accept Todd's assertions, there exists an issue of fact as to whether USNH relied on defendants' fraudulent concealment. *See, e.g., Schneider v. OG & C Corp.*, 684 F.Supp. 1269 (S.D.N.Y.1988) (affidavits that are not so incredible as to require rejection by reasonable minds create an issue of fact for jury to determine).

On these facts, the court finds that as to defendants USG and Keene, a finder of fact could reasonably conclude that they intentionally concealed the dangers of asbestos and that USNH relied, to its detriment, on the concealment. *Compare Flanagan v. AC & S, Inc.*, No. 86–4392–0, 1989 WL 156784 (D.Kan., Nov. 21, 1989) (where asbestos plaintiff directs court to no portions of record showing that defendants suppressed facts that they had a duty to disclose, movant is entitled to summary judgment).

With respect to defendant Pfizer, Inc., plaintiff has presented no evidence of actions that would constitute fraud. Accordingly, the motion for summary judgment on Count V (misrepresentation) is denied as to defendants United States Gypsum and Keene Corporation and granted as to defendant Pfizer, Inc.

### B. Conspiracy (Count VI)

"A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose...." *Jay Edwards, Inc. v. Baker*, 130 N.H. 41, 47, 534 A.2d 706, 709 (1987) (quoting 15A C.J.S. *Conspiracy* § 1(1), at

596). Its essential elements are: (1) two or more persons (including corporations); (2) an (unlawful) object to be accomplished; (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages proximately resulting from the acts. *Jay Edwards, supra* (citing *Bonds v. Landers*, 279 Or. 169, 174, 566 P.2d 513, 516 (1977); *Dickey v. Johnson*, 532 S.W.2d 487, 502 (Mo.Ct.App.1975).

There is no such thing in New Hampshire, however, as a civil action based upon conspiracy alone. *Town of Hooksett School Dist. v. W.R. Grace Co.*, 617 F.Supp. 126 (D.N.H.1984) (citing *Stevens v. Rowe*, 59 N.H. 578 (1880)). For a civil conspiracy to exist, there must be an underlying tort which the alleged conspirators agreed to commit. Conspiracy, then, serves as a device through which vicarious liability for the underlying tort may be imposed on all who commonly plan, take part in, further by cooperation, lend aid to, or encourage the wrongdoers' acts. *In re North Dakota Personal Injury Asbestos Litig.*, 737 F.Supp. 1087 (D.N.D.1990); *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480 (D.C.Cir.1989); *see also Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) (function of civil conspiracy doctrine is to "yoke particular individuals to civil torts charged in the complaint"); *Mohammed v. Union Carbide Co.*, 606 F.Supp. 252 (E.D.Mich.1985) (allegation of conspiracy must be coupled with substantive theory of liability in order to sustain claim); *Valdan Sportswear v. Montgomery Ward & Co.*, 591 F.Supp. 1188 (S.D.N.Y.1984) (under New York law, civil conspiracy claim is proper only to establish joint liability by co-participants in tortious conduct). *But see Burnett v. Nicolet, Inc.*, 818 F.2d 1098 (4th Cir.1986); *Belkow v. Celotex Corp.*, 722 F.Supp. 1547 (N.D.Ill. 1989).

Defendants premise their motion regarding the conspiracy count on their allegation that plaintiff's underlying tort, fraudulent concealment, must be dismissed, and therefore the conspiracy claim should also fail. The court, however, has already determined that plaintiff's evidence of fraudu-

lent concealment creates a genuine issue of material fact with respect to defendants USG and Keene. *See supra,* discussion at Section IIIA. Since defendants do not appear to dispute the fact that plaintiff has established the other elements of civil conspiracy, the court finds that defendants USG and Keene have failed to meet their initial burden of establishing the lack of a genuine material factual issue. *See Finn v. Consolidated Rail Corp.,* 782 F.2d 13, 15 (1st Cir.1986). Accordingly, the motion for summary judgment on Count VI (conspiracy) is granted as to Pfizer and denied as to USG and Keene.

## IV. Motion of Certain Defendants for Partial Summary Judgment (document no. 255)

The crux of defendants' argument is that plaintiff failed to comply with a court-ordered deadline under which plaintiff was required to provide product identification information as to each defendant.[10] Therefore, pursuant to the order, defendants seek summary judgment as to those buildings in which plaintiff has failed to identify defendants' products.[11]

USNH claims that the court's order did not affect its Counts VI (conspiracy) and IX (market share, alternative, and enterprise liability). Plaintiff claims that those counts do not require specific product identification.[12]

The court agrees that the March 10, 1988, order does not dispose of Counts VI and IX. However, the court finds that none of plaintiff's "non-traditional" theories of liability (alternative, market share, or enterprise) are applicable to this action. A discussion of the theories and the reasons why they do not apply follows.

**10.** The court's March 10, 1988, order (document no. 212) in relevant part provides that

plaintiff shall submit a final statement of all product identification information with respect to each and every defendant including all evidence on the issue of product identification on which the plaintiff intends to rely at trial. Any defendant not identified by product by this date shall be granted summary judgment as to buildings in which it is not identified.

### A. Alternative Liability

USNH urges the court to apply alternative liability as a substitute for specifically linking asbestos-containing products in USNH buildings to a particular defendant.

■ Alternative liability dispenses with the traditional tort law causation requirement, wherein the imposition of liability depends upon the plaintiff's proving that the defendant manufacturer made the product that caused the plaintiff's injury. *Starling v. Seaboard Coast Line R.R.,* 533 F.Supp. 183, 187 (S.D.Ga.1982). Alternative liability may be imposed when all defendants who could have caused an injury are before the court and the plaintiff shows that all of them acted negligently in a way that could have caused the injury, but no proof is available identifying the actual defendant whose conduct directly caused the injury. Restatement (Second) of Torts § 433B(3) (1965).

The seminal case of alternative liability is *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948), in which two hunters each negligently shot at the injured party, but it was impossible to determine which actually caused the injury. The court found that as between plaintiff and defendants, each defendant should bear the burden of proving that he did not cause plaintiff's injury. The policy behind this exception to traditional tort law causation is the "injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them caused the harm." Restatement, *supra,* § 433B, comment (8).

Order at 4.

**11.** The deadline was first set at July 1, 1988, and later extended to August 15, 1988.

**12.** At different times in this action, all parties treat various theories of liability (e.g., alternative, market share, enterprise) interchangeably. A review of the subject has revealed that each is a separate theory, and the court discusses each separately *infra.*

The New Hampshire Supreme Court has not recognized the theory of alternative liability.[13] Although this court does have the power to interpret state law as it believes the state courts would, *Erie v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), it must first ask whether, even assuming New Hampshire adopts the theory, it would apply to this case. *Kinnett v. Massachusetts Gas & Elec. Supply Co.*, 716 F.Supp. 695 (D.N.H.1989) (citing *Morton v. Abbott Labs*, 538 F.Supp. 593, 598–600 n. 9 (M.D.Fla.1982)).

A review of cases in other jurisdictions that consider application of alternative liability leads to the conclusion that even if New Hampshire adopted this theory, it should not be applied in this case.

The Michigan Supreme Court adopted alternative liability in *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164 (1984), involving a suit against a large number of drug manufacturers for injuries caused by DES. The court held that the criteria for applying alternative liability are: (1) all defendants must have acted tortiously; (2) plaintiff must have been harmed by the conduct of at least one of the defendants, and therefore plaintiff must bring all possible defendants before the court; and (3) plaintiff must be unable to identify which defendant caused the injury. *Id.* at 331–32, 343 N.W.2d 164.

In *Marshall v. Celotex*, 651 F.Supp. 389, 392 (E.D.Mich.1987), the court held in an asbestos-personal injury case that, where two manufacturers who might possibly have supplied the injury-causing asbestos were not named as defendants, use of alternative liability was precluded. The court cited *Vigiolto v. Johns–Manville*, 643 F.Supp. 1454 (W.D.Pa.1987), which also re-jected application of alternative liability in an asbestos-personal injury case. The *Vigiolto* court said:

> '[I]f plaintiff cannot prove who caused his injuries and does not name as defendants all who possibly could have, plaintiff has not proved that at least one of the named defendants has caused the harm. ... the plaintiff must name as defendants all who could have caused the complained of injury.'

*Marshall, supra,* at 392 (quoting *Vigiolto,* at 1457).

Other jurisdictions have also refused to apply the alternative liability theory in the context of asbestos-personal injury litigation. *Thompson v. Johns–Manville*, 714 F.2d 581 (5th Cir.), *cert. denied*, 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1983) (where plaintiff identified some manufacturers who supplied injury-causing asbestos, alternate liability is inapplicable); *Gaulding v. Celotex*, 748 S.W.2d 627 (Tex. Ct.App.1988); *Nutt v. A.C. & S. Co.*, 517 A.2d 690 (Del.Super.1986); *Goldman v. Johns–Manville*, 33 Ohio St.3d 40, 514 N.E.2d 691 (Ohio 1987).

In *Goldman*, the court gave different reasons for not applying alternative liability in the asbestos context. First, the court explained, alternative liability is not a complete substitute for defendant-product identification. Rather, it "relaxes" the identification requirement, but only where the plaintiff shows that all defendants acted tortiously. *Id.* 514 N.E.2d at 696.

The *Goldman* court also rejected alternative liability in asbestos cases, explaining that the theory is limited to cases where the defendants' actions create a substantially similar risk of harm. *See* Restatement (Second) of Torts § 322B(3), comment

---

13. USNH cites two cases in support of the proposition that New Hampshire "approves" or "embraces" the alternative liability theory, although it has yet to formally adopt the theory. Plaintiff's Memorandum on Conspiracy and Market Share Liability in Support of Objection to Motions for Summary Judgment and Motions to Dismiss (document no. 265), at 14. Neither case, however, supports plaintiff's proposition. In *Heath v. Sears Roebuck*, 123 N.H. 512, 525, 464 A.2d 288 (1983), the New Hampshire Supreme Court's quotation from *Bichler v. Eli Lilly & Co.*, 55 N.Y.2d 571, 450 N.Y.S.2d 776, 436 N.E.2d 182 (1982)—a case involving *enterprise liability* in a DES case—was in the context of a statute of limitations claim, with no mention of alternative liability. *Shepard v. General Motors*, 423 F.2d 406 (1st Cir.1970), is also inapposite. *Shepard*, which was strictly concerned with the damages portion of a products liability case, not liability, merely restated the proposition that joint and several liability exists in New Hampshire for joint—and identified—tort feasors.

h. Because there are several types of asbestos-containing products, used in various quantities, the court concluded that alternative liability would inequitably allocate liability.[14]

In those cases where the theory was used, all possible defendants were before the court. *See Menne v. Celotex Corp.,* 861 F.2d 1453 (10th Cir.1988); *City of Detroit v. Celotex,* No. 84–42963 (Wayne County (Mich.) Cir.Ct. Feb. 1, 1988).

An exception to the alternative liability theory requirement that all possible defendants be joined was made in *Gard v. Raymark Indus., Inc.,* 185 Cal.App.3d 583, 229 Cal.Rptr. 861 (1986). The *Gard* court held that where certain defendants can't be joined because some are in bankruptcy proceedings and others have settled with the plaintiff, the burden may be shifted to defendants *so long as all defendants who can be joined are before the court.*

Here, USNH sued only twenty-eight out of over one hundred asbestos manufacturers who could have supplied asbestos products to USNH buildings. Therefore, even applying the *Gard* exception to those manufacturers who have settled or entered bankruptcy proceedings, alternative liability is inappropriate for this action.

B. Market Share Liability

■ In *Sindell v. Abbott Labs,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980), the court modified the alternative liability theory stated in *Summers, supra.*

The plaintiff in *Sindell* was exposed to DES prior to her birth through her mother's ingestion of the drug. After developing tumors and other precancerous growths, she sued several drug companies on behalf of herself and other similarly situated women, alleging that defendants were jointly and individually negligent for manufacturing, marketing, and promoting DES without adequate testing or warning. The court declined to apply the *Summers*-type alternative liability because "if

we measure the chance that any particular manufacturer supplied the injury-causing product by the number of producers of DES, there is a possibility that none of the five defendants produced the offending substance and that the responsible manufacturer will escape liability." *Sindell, supra,* 163 Cal.Rptr. at 144, 607 P.2d at 936.

The court held that where the plaintiff joins in the action a "substantial share" of DES manufacturers, each defendant will be held liable for the proportion of the judgment represented by its share of the market, unless it demonstrates that it could not have made the product which caused the plaintiff's injuries. *Id.* 163 Cal.Rptr. at 145, 607 P.2d at 937.

Some courts have used the *Sindell* market-share liability theory in drug cases. *See McElhaney v. Eli Lilly & Co.,* 564 F.Supp. 265 (D.S.D.1983) (applying South Dakota law); *McCormack v. Abbott Labs,* 617 F.Supp. 1521 (D.Mass.1985); *Martin v. Abbott Labs,* 102 Wash.2d 581, 689 P.2d 368 (1984); *Smith v. Eli Lilly & Co.,* 173 Ill.App.3d 1, 122 Ill.Dec. 835, 527 N.E.2d 333 (1988); *Collins v. Eli Lilly & Co.,* 116 Wis.2d 166, 342 N.W.2d 37, *cert. denied,* 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984).

Many courts, however, have declined to apply the marketshare theory in drug cases, and almost all have refused to apply it in asbestos cases. *Tidler v. Eli Lilly & Co.,* 851 F.2d 418 (D.C.Cir.1988) (DES); *Bateman v. Johns–Manville,* 781 F.2d 1132 (5th Cir.1986) (asbestos); *Thompson v. Johns–Manville,* 714 F.2d 581 (5th Cir.), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1983) (asbestos); *Dawson v. Bristol Labs,* 658 F.Supp. 1036 (W.D.Ky. 1987) (tetracycline); *In re Related Asbestos Cases,* 543 F.Supp. 1152 (N.D.Cal.1982) (asbestos); *Morton v. Abbott Labs,* 538 F.Supp. 593 (M.D.Fla.1982) (DES); *Starling v. Seaboard Coast Line R.R., supra,* 533 F.Supp. 183 (asbestos); *Hannon v. Waterman Steamship Corp.,* 567 F.Supp. 90 (E.D.La.1983) (asbestos); *Burke v.*

---

**14.** The *Goldman* court also used this "non-fungibility aspect" of asbestos products to rule out use of market-share liability. This Court will discuss that theory *infra.*

*Johns–Manville Corp.*, No. C–1–289 (S.D. Ohio Aug. 2, 1983) (asbestos); *Prelick v. Johns–Manville*, 531 F.Supp. 96 (W.D.Pa. 1982) (asbestos); *Mizell v. Eli Lilly & Co.*, 526 F.Supp. 589 (D.S.C.1981) (DES); *Ryan v. Eli Lilly & Co.*, 514 F.Supp. 1004 (D.S.C. 1981) (DES) (applying both North and South Carolina law); *Enright v. Eli Lilly & Co.*, 141 Misc.2d 194, 533 N.Y.S.2d 224 (Sup.Ct.1985) (DES); *Goldman v. Johns–Manville*, 33 Ohio St.3d 40, 514 N.E.2d 691 (1987) (asbestos); *Gaulding v. Celotex*, 748 S.W.2d 627 (Tex.Ct.App.1988); *Case v. Fibreboard Corp.*, 743 P.2d 1062 (Okla.1987) (asbestos); *Celotex Corp. v. Copeland*, 471 So.2d 533 (Fla.1985) (asbestos); *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241 (Mo.1984) (DES).

Most courts have refused to apply market-share liability in asbestos cases due to the "non-fungibility" of asbestos. *See, e.g., Goldman v. Johns–Manville, supra* (asbestos is not a single product, but a general name for a family of minerals contained in 2,000 to 3,000 different products, and thus is not fungible). On the other hand, those courts that have applied the theory to DES cases, relied on the fact that DES is a product in which all manufacturers used an identical formula, thus allowing for a practicable establishment of the relevant market and proportionate market share liability. *See, e.g., Sindell, supra.*

Plaintiff claims that the instant asbestos-in-buildings case is distinguishable from the legion of personal injury asbestos cases in which market-share liability has been rejected. Plaintiff's Memorandum at 9. There is no persuasive justification for reaching a different result in property-damage cases. In fact, the California appeals court, which "invented" market-share liability in *Sindell*, declined to extend the theory to an asbestos-in-building case. *Mullen v. Armstrong World Indus.*, 200 Cal.App.3d 250, 246 Cal.Rptr. 32 (1988). The plaintiffs in *Mullen* were homeowners who sued several asbestos companies on a market-share theory for damage to their homes. The court said asbestos was not a single-formula, fungible product to which the market-share theory would be applied. Accordingly, as with alternate liability, re-

gardless of whether or not New Hampshire courts recognize market-share liability, the theory does not apply to these facts.

## C. Enterprise Liability

■ The theory of enterprise liability is that the costs of an enterprise or activity ought to be borne by the enterprise which created them.

Enterprise liability was recognized first in *Hall v. E.I. DuPont De Nemours & Co.*, 345 F.Supp. 353 (E.D.N.Y.1972), in which the court stated that when manufacturers are few in number, are jointly aware of the risks, and jointly have the capacity to, reduce or affect those risks, such as operating through a trade association, liability may be imposed on all of them.

*Hall* involved eighteen separate accidents over several years in which children were injured by blasting caps. Damages were sought from the manufacturers and their trade association on the basis of their failure to place warnings on the caps or take other safety measures. In some instances, the plaintiffs were unable to identify the particular manufacturers of the caps causing the injuries.

The court permitted joinder of substantially all of the blasting-cap industry, even though only one manufacturer had actually caused the harm. The court concluded that plaintiffs should be allowed to use an enterprise liability theory because the defendants, acting independently, followed "industry-wide standards and customs." *Hall, supra*, at 374.

*Hall*, however, cautioned that the enterprise liability theory was particularly applicable to industries composed of a small number of units.

To establish that the explosives industry should be held jointly liable on enterprise liability grounds, plaintiff will have to demonstrate defendants' joint awareness of the risks at issue ... and their joint capacity to reduce or affect those risks.... We wish to emphasize the special applicability to industries composed of a small number of units. What would be fair and feasible with regard to an

industry of five or ten producers might be manifestly unreasonable if applied to a decentralized industry composed of thousands of small producers.[15]

*Id.* at 378.

■ In the instant case, the plaintiff claims that the defendants, perhaps a "manageable" group by *Hall* standards, represent the "substantial percentage of asbestos manufacturers and distributors who sold products for use in plaintiff's buildings." Amended Complaint ¶ 50. This misses the point of the theory. Since the enterprise liability theory seeks to hold *all* manufacturers in a given industry liable, the dispositive factor is the absence of substantially the entire asbestos industry. Therefore, the court finds enterprise liability inapplicable to this action.[16]

### D. Concert of Action

■ Concert of action is the fourth theory plaintiff urges the court to apply. Plaintiff's Memorandum on Conspiracy and Market Share Liability in Support of Objections to Motions for Summary Judgment and Motions to Dismiss ("Plaintiff's Memorandum") at 15.

The concert of action theory is premised upon the assistance of various producers of a product to each other to accomplish a tortious result. *Shackil v. Lederle Labs,* 219 N.J.Super. 601, 530 A.2d 1287 (A.D. 1987). The parties, "in pursuance of a common plan or decision to commit a tortious act, actively take part in it, or further it by cooperation or request...." W. Keaton, D. Dobbs, R. Keaton, & D. Owen,

*Prosser & Keaton on the Law of Torts* § 46 (5th ed. 1984).

Generally, concert of action theories track the language of the Restatement (Second) of Torts § 876, 877(a) (formerly 876(a)) ("Restatement"), which provides:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he:

(a) does a tortious act in concert with the other or pursuant to a common decision with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

*See also Marshall v. Celotex,* 691 F.Supp. 1045 (E.D.Mich.1988); *Payton v. Abbott Labs,* 512 F.Supp. 1031 (D.Mass.1981); *Shackil, supra.* Implicit in the proof necessary to sustain a concert of action theory is the commission of tortious acts by defendants. In New Hampshire, this is akin to what is necessary to prove conspiracy. *See supra,* discussion in Section IIIB. Here, the claimed underlying tortious conduct is defendants' alleged fraudulent concealment of the dangers of asbestos.

Having already addressed and ruled upon the conspiracy issue, i.e., the court finds that preserving the concert of action theory would be unnecessarily duplicative.

---

**15.** In *Hall,* six manufacturers comprised substantially the nation's entire blasting-cap industry.

**16.** The decision to reject enterprise liability in this context is consistent with virtually every other court that has faced the issue. *See Thompson v. Johns–Manville,* 714 F.2d 581 (5th Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984); *Dawson v. Bristol Labs,* 658 F.Supp. 1036 (W.D.Ky.1876); *Marshall v. Celotex,* 651 F.Supp. 389 (E.D.Mich. 1987); *Griffin v. Tenneco Resins,* 648 F.Supp. 964 (W.D.N.C.1986); *Vigiolto v. Johns–Manville, supra; Morton v. Abbott Labs,* 538 F.Supp. 593 (M.D.Fla.1982); *Starling v. Seaboard Coast Line R.R., supra,* 533 F.Supp. 183; *Ryan v. Eli Lilly & Co.,* 514 F.Supp. 1004 (D.S.C.1981); *Gray v. United States,* 445 F.Supp. 337 (S.D.Tex.1978); *Farmer v. Newport,* 748 S.W.2d 162 (Ky.App. 1988); *Mulcahy v. Eli Lilly & Co.,* 386 N.W.2d 67 (Iowa 1986); *Sheffield v. Eli Lilly & Co.,* 144 Cal.App.3d 583, 192 Cal.Rptr. 870 (1983); *Namm v. Charles E. Frosst & Co.,* 178 N.J.Super. 19, 427 A.2d 1121 (1981); *Sindell v. Abbott Labs, supra; Davis v. Yearwood,* 612 S.W.2d 917 (Tenn.App.1980); *In re Beverly Hills Fire Litigation,* No. 77–79 (E.D.Ky.1979); *but see Bichler v. Eli Lilly & Co.,* 79 A.D.2d 317, 436 N.Y.S.2d 625 (1st Dept.1981), *aff'd,* 55 N.Y.2d 571, 450 N.Y. S.2d 776, 436 N.E.2d 182 (1982); *Hall, supra.*

For the reasons stated herein, to the extent the plaintiff relies on alternative, market-share, enterprise, or concert of action liability, defendants' motion for partial summary judgment (document no. 255) is granted.[17]

## V. Defendant USG's Motion for Partial Summary Judgment (document no. 447)

Defendant USG moves for partial summary judgment based on plaintiff's failure to timely provide product identification information to support its claim that USG products were located in Hitchcock Hall on the University of New Hampshire campus at Durham and in the Keene State College Science Center.

The motion is based on an order dated March 10, 1988, in which the Magistrate established a discovery schedule. That order provided that by July 1, 1988:

> Plaintiff shall submit a final statement of all product identification information with respect to each and every defendant including all evidence on the issue of product identification on which the plaintiff intends to rely at trial. Any defendant not identified by product by this date shall be granted summary judgment as to buildings in which it is not identified.

March 10 Order at 4. The court extended the deadline for floor and ceiling product identification to October 15, 1988.[18] Defendant argues that by October 15, 1988, USNH had not submitted any product identification evidence linking USG to the two buildings named in this motion, and therefore the court should grant summary judgment as to those buildings.

### A. Hitchcock Hall

The dispute over Hitchcock Hall is whether it should be considered a separate entity, as defendant argues, or, as plaintiff claims, whether it is only one part of a larger unit, together with Randall and Devine Halls. Because USNH claims the three dormitories are in fact one building, it argues that the timely notice to USG of product identification with respect to Randall Hall is also timely as to Hitchcock.[19]

USNH specifically identified USG products in Randall Hall in a July 1, 1988, product identification list. USG's Motion for Partial Summary Judgment ("Defendant's Motion"), Exhibit A at 3. The same list identified another company as the manufacturer of asbestos products in Hitchcock Hall. USNH argues that even if the identification was untimely, USG suffered no prejudice by the delay, and therefore the court should deny this motion.

The court finds that the evidence does not support plaintiff's claim that Randall, Hitchcock, and Devine Halls constitute one building. For instance, the plaintiff's own product identification list has separate designations for "Randall" and "Hitchcock". Defendant's Motion, Exhibit A at 3. In addition, USNH provided separate Asbestos Alteration Notices for Randall and Hitchcock. Defendant's Motion, Exhibit D. Further, the court finds meritless plaintiff's argument that "although information is provided separately for the two sections, the [alteration] notice for Randall refers to Hitchcock and the notice for Hitchcock refers to Randall." Plaintiff's Objection to Defendant's Motion ¶ 6,

Having concluded that the three dormitories are separate buildings, the court finds that USNH submitted product identification evidence linking USG to Hitchcock

---

17. The court recognizes that a previous order in this action indicated that the question of possible adoption of the theories discussed in this motion would be certified to the New Hampshire Supreme Court. Since a thorough review of these theories reveals their inapplicability to this action (regardless of the New Hampshire Supreme Court's stance), the court finds that certification is not necessary.

18. USG is only involved in the ceiling product phase of this litigation.

19. USG claims it first received oral notice of USNH's intent regarding Hitchcock on May 16, 1989, via an "informal comment" made by plaintiff's attorney during a deposition. Defendant's Motion at 3. USNH notified USG in writing on July 10, 1989. Defendant's Motion, Exhibit F.

Hall well after the court-ordered deadline.[20] This late evidence consisted of a report made by an expert whom USNH brought into the case after defendants attacked the credibility and accuracy of plaintiff's original expert. Plaintiff's Objection to Defendant's Motion at 7; Defendant's Reply to Plaintiff's Objection at 15–16.

Rule 16(b), Fed.R.Civ.P., gives the court the power to order discovery schedules. It also allows the court to modify the schedule for "good cause". The product identification deadline at issue here was twice extended. The magistrate and, on appeal, the court, refused further extension. *See* Order of Nov. 22, 1988. The plaintiff now seeks another extension, yet fails to show any reason, other than to remedy a possible error by its expert, why such an extension should be retroactively granted.

Accordingly, defendant USG's motion for partial summary judgment is granted with respect to Hitchcock Hall.

### B. Keene Science Center

Plaintiff acknowledges that its identification of USG products in two lecture halls at Keene Science Center was late. Plaintiff's Objection ¶ 19. But plaintiff argues that discovery performed by another defendant, now out of this action, can suffice to cure the lack of USG discovery. *Id.* The court disagrees. Neither the discovery conducted by another party nor the offer to allow USG additional time for discovery with respect to Keene Science Center is relevant to the effects of this untimely disclosure. Until this belatedly interposed claim by USNH, there was no reason to conduct any discovery of USG products in the Keene Science Center. USG should not be required to do so at this late date.

As with Hitchcock Hall, the plaintiff is, in effect, seeking a retroactive extension of the product identification deadline. The court sees no sufficient cause to ignore its March 10 Order. Accordingly, Defendant's

Motion for Partial Summary Judgment with respect to the Keene Science Center is granted.

### VI. Defendant Keene Corporation's Motion for Partial Summary Judgment (document no. 547)

In this motion, defendant Keene claims that plaintiff's product identification evidence with respect to certain USNH buildings is insufficient as a matter of law.

The bulk of defendant's attack is aimed at thermal product identification evidence supplied by plaintiff's expert, Dr. Arthur Rohl. In product samples taken from numerous USNH buildings, Dr. Rohl concludes that a sample is "consistent with" the products of the defendant and other manufacturers. Defendant Keene Corporation's Motion for Summary Judgment ("Keene Motion"), Exhibit B.

In addition, Keene charges that letters from a USNH insulation subcontractor indicating an intention to install Keene thermal products are insufficient to create a factual dispute because they are not evidence that Keene products were actually installed. Memorandum of Law in Support of [Keene Motion] at 14–15.

Product identification is relevant to the issue of causation because it links plaintiff's claimed injury to defendant's alleged wrongful conduct. *Kinnett v. Massachusetts Gas & Elec. Supply Co., supra,* 716 F.Supp. 695); *see also* W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser & Keeton on the Law of Torts* § 41.

The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, *or the probabilities are at best evenly balanced,* it

---

**20.** USNH did not send the results of a "new" Hitchcock sample to USG until August 18, 1989.

Defendant's Motion ¶ 10.

becomes the duty of the court to direct a verdict for the defendant.

Prosser at 269 (emphasis added).

In disputing the evidence of Dr. Rohl's reports involving thermal products, defendant relies on the reasoning of *Catasauqua Area School Dist. v. Eagle–Picher Indus., Inc.,* 118 F.R.D. 566 (E.D.Pa.1988) ("*Catasauqua II*"), which presents facts almost identical to this case. In *Catasauqua II,* plaintiff in an asbestos-in-school-building action moved to reopen a summary judgment based on newly discovered evidence. That evidence was a report by Dr. Rohl which said that a sample was "consistent with" the product of the defendant and other manufacturers. The court said that Dr. Rohl's evidence, which does not clearly identify the manufacturer of the product, would not be sufficient to defeat a motion for summary judgment. *Id.* at 571–72.

In response to the attack on Dr. Rohl's evidence, USNH asserts that a material question of fact "necessarily exists" because Dr. Rohl's analysis has not ruled out the presence of the defendant's product. Therefore, plaintiff argues, the questions about Dr. Rohl's evidence concern its weight, rather than its sufficiency, and should be submitted to a jury.[21]

This court finds that Dr. Rohl's analyses do not make any conclusion "more likely than not." Rather, they leave the probabilities "at best, evenly balanced." *See Prosser & Keeton, supra,* at 269. Therefore, they are insufficient as a matter of law.[22]

The court also agrees with defendant Keene that the subcontractors' approval documents do not create an issue of fact

because they do not address the issue of whether Keene products were actually installed. Keene Memorandum, Exhibit F.

*Catasauqua Area School Dist. v. Raymark Indus.,* 662 F.Supp. 64 (E.D.Pa.1987) ("*Catasauqua I*"), addressed this issue. In *Catasauqua I,* the plaintiff offered a list of materials approved for installation and testimony from a draftsman of the construction plans as identification evidence. The court rejected both forms of identification because neither indicated that the defendant's products were actually used. The court stated, "Except for [the draftsman's] testimony and the materials list, plaintiff has no evidence that the [defendant's asbestos products] were actually installed in the building." *Id.* at 66.

The same reasons are applicable here, where the approval documents contain no corroborative evidence to show that Keene products were actually installed. To give these documents such an interpretation would be to allow the jury to indulge in impermissible speculation. *Catasauqua II, supra,* at 572.

For the foregoing reasons, the motion for partial summary judgment of defendants Keene Corporation (document no. 547) is granted.[23]

## CONCLUSION

The court's rulings on the dispositive motions pending in this action are summarized as follows:

—Defendants' motion for partial summary judgment (document no. 255) is granted.

—Defendants' motion for summary judgment (document no. 438) is denied.

---

**21.** USNH also claims that the use of alternative, marketshare, and other nontraditional theories of liability obviates the need for specific product identification. The Court has already rejected those theories. Thus, product identification continues to be a necessary element of plaintiff's case.

**22.** The defendant also claims that Dr. Rohl's analyses are faulty as a matter of law because he relied on only one sample for each report. Having granted this motion on other grounds, the Court does not address this issue.

**23.** With respect to thermal products allegedly manufactured by defendant Keene, this order regarding Keene's motion (document no. 547) affects the following buildings: (Durham) Englehardt Hall, Forest Park, Gibbs Hall, Heating Plant, Hood House, Huddleston Hall, Hunter Hall, Kingsbury Union, Memorial Union, Murkland Hall, Service Building, Service Center, Zais Hall, Diamond Library, Field House, New England Center–Kellogg Building, New England Center–Adams Tower, Parsons Hall, Stillings Hall; (Keene) Dining Commons, Fiske Hall, Heating Plant, Science Center; (Plymouth) Boyd Hall.

—Defendants' motion to dismiss (document no. 439) is denied.

—Defendant USG's motion for summary judgment on Counts V and VI (document no. 446) is denied.

—Defendant USG's motion for partial summary judgment (document no. 447) is granted.

—Pfizer's motion for summary judgment on Counts V and VI (document no. 458) is granted.

—Defendant Keene's motion for partial summary judgment (document no. 547) is granted.

—Defendant Keene's motion for summary judgment on Counts V and VI (document no. 549) is denied.

Several motions for summary judgment (documents no. 254, 441, 442 and 445) were filed by defendants who are no longer parties to this litigation, and they are therefore moot.

The parties are ordered to appear before the court on Wednesday, February 20, at 9 a.m., for a status/settlement conference. *See* Order of June 25, 1990.

SO ORDERED.